## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED FOOD AND COMMERCIAL WORKERS UNION, LOCAL No. 663; UNITED FOOD AND COMMERCIAL WORKERS UNION, LOCAL No. 440; UNITED FOOD AND COMMERCIAL WORKERS UNION, LOCAL No. 2; and UNITED FOOD AND COMMERCIAL WORKERS UNION, AFL-CIO, CLC, | COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF (Administrative Procedure Act)<br><br>Civil Action No. 19-cv-____ |
| Plaintiffs, | |
| v. | |
| UNITED STATES DEPARTMENT OF AGRICULTURE, | |
| Defendant. | |

## INTRODUCTION

1.     Plaintiffs, three local labor unions and their affiliated international labor union that represent workers in swine slaughter and processing plants, bring this action pursuant to the Administrative Procedure Act (APA), 5 U.S.C. §§ 702 & 706(2), seeking injunctive and declaratory relief with respect to an October 2019 rule promulgated by the United States Department of Agriculture's (USDA) Food Safety Inspection Service (FSIS). USDA, Final Rule, Modernization of Swine Slaughter Inspection, 84 Fed. Reg. 52300 (Oct. 1, 2019). The Rule dramatically alters the way in which pigs are slaughtered and processed for human consumption in the United States, abandoning protections for American workers and consumers that have been in place for decades. The Rule entirely eliminates maximum line speeds and reduces the number of government-employed "online" safety inspectors on the lines by forty percent, instead allowing

the plants to use their own employees—with no required training—to monitor compliance with health and safety standards.

2.       As thousands of commenters told USDA during the rulemaking process, the Rule will jeopardize the lives and safety of both consumers of pork products and workers like Plaintiffs' members. Experts told USDA during the rulemaking that "there is no doubt that increasing line speed will increase laceration injuries to workers," and the elimination of a maximum line speed will "potentially cause an epidemic of disabling work-related MSDs [musculoskeletal disorders]." Comments from Professor Melissa J. Perry, May 8, 2018, FSIS-2016-0017-83467 (Perry Comments); Comments from Association of Occupational and Environmental Clinics, May 8, 2018, FSIS-2016-0017-79890 at 1 (AOEC Comments). Commenters provided the agency with dozens of peer-reviewed studies and other expert analyses that made it clear that eliminating maximum line speeds substantially increases the risk of injury to workers in swine slaughter and processing facilities, like Plaintiffs' members.

3.       In issuing the Rule, USDA did not dispute the massive amount of evidence in the record showing that eliminating maximum line speeds would put the life and safety of thousands of workers at risk. Rather, its sole response was to state that USDA lacks "authority" to "regulate issues related to establishment worker safety." 84 Fed. Reg. at 52305. But USDA's authorizing statute does not bar it from considering the impacts of its actions on worker safety. Indeed, federal agencies regularly consider the consequences of their actions on workers, small businesses, states, Indian tribes, and other groups, even when relevant statutes do not explicitly require them to consider the impacts on those groups.

4.       For decades, USDA has considered its actions' impacts on worker safety. Even in the notice of proposed rulemaking for this Rule, USDA "recognize[d] that evaluation of effects of

line speed on food safety should include the effects of line speed on establishment employee safety." USDA, Proposed Rule, Modernization of Swine Slaughter Inspection, 83 Fed. Reg. 4780, 4796 (Feb. 1, 2018) (NPRM). USDA has not explained or even acknowledged its reversal of position.

5.      USDA's failure to consider the impacts of its actions on worker safety was arbitrary and capricious, as was its failure to acknowledge and explain its departure from past practice considering such impacts.

6.      USDA has also violated both the APA and the Federal Meat Inspection Act (FMIA), 21 U.S.C. § 601 *et seq*., with respect to its changes to the online inspection system. Commenters advised the agency that the reduction in number of federal inspectors on the lines would put consumer and worker health and safety at risk, and the agency's rejection of these comments was based on a methodologically flawed analysis. Moreover, USDA failed to meaningfully rebut the conclusion that FSIS inspectors cannot conduct the "critical appraisal" of each animal carcass required by the FMIA when their numbers are reduced and line speeds are unlimited.

7.      Because USDA failed to comply with the requirements of reasoned decisionmaking in issuing the Rule, and because the Rule is also inconsistent with Congress's mandate to USDA, as set forth in the FMIA, the Rule should be declared arbitrary, capricious, and contrary to law, and set aside.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction under 28 U.S.C. § 1331.

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 (e)(1) because Plaintiff United Food and Commercial Workers Union, Local No. 663 resides in this district.

**PARTIES**

10.     Plaintiff United Food and Commercial Workers Union, Local No. 663 is a labor organization headquartered in Brooklyn Center, Minnesota. Local 663 has more than 13,000 members in a variety of industries in Minnesota and Iowa, including approximately 1,900 members who work at the JBS USA swine slaughter and processing plant in Worthington, Minnesota. The JBS plant is subject to the Rule, and is one of the 40 high-volume establishments that USDA has stated it expects to increase its line speeds and change inspection methods pursuant to the Rule. *See* 84 Fed. Reg. at 52322. The maximum line speed at that plant is currently 1,106 head per hour on the slaughter lines. That plant has recently begun the process of adding coolers and expanding the kill floor and loading docks, which would allow it to increase the line speed.

11.     Plaintiff United Food and Commercial Workers Union, Local No. 440 is a labor organization headquartered in Denison, Iowa. Local 440 has more than 1,200 members in a variety of industries in western Iowa, including approximately 1,100 members who work at the Smithfield swine slaughter and processing plant in Denison. The Smithfield plant is subject to the Rule, and is one of the 40 high-volume establishments that USDA has stated it expects to increase its line speeds and change inspection methods pursuant to the Rule. *See* 84 Fed. Reg. at 52322. The maximum line speed at that plant is currently 1,106 head per hour on the slaughter lines. Plant management has expressed a desire to remodel its facilities in a manner that would allow it to increase the line speed.

12.     Plaintiff United Food and Commercial Workers Union, Local No. 2 is a labor organization headquartered in Bel Aire, Kansas. Local 2 has more than 13,000 members in a variety of industries in Kansas, Missouri, and Oklahoma. Local 2 represents production workers in two different swine slaughter and processing plants that are subject to the Rule, and both are

4

among the 40 high-volume establishments that USDA has stated it expects to increase its line speeds and change inspection methods pursuant to the Rule. *See* 84 Fed. Reg. at 52322. Local 2 represents approximately 2,500 workers at a Triumph Foods plant in St. Joseph, Missouri, where the maximum line speed is currently 1,106 head per hour on the slaughter lines. That plant's current layout indicates it has the ability to increase its line speeds should the Rule go into effect. Local 2 represents approximately 2,100 workers at a Seaboard Foods plant in Guymon, Oklahoma, where the maximum line speed is also currently 1,106 head per hour on the slaughter line. Plant management in Guymon has indicated it plans to expand its facilities in a manner that would allow it to increase the line speed.

13.     Plaintiff United Food and Commercial Workers International Union (UFCW) is an international labor organization, headquartered in Washington, DC. It has approximately 1.3 million members, including approximately 31,000 who work in the hog slaughter and processing industry, at 17 of the 40 high volume establishments that USDA has stated it expects to implement the Rule.  *See* 84 Fed. Reg. at 52322.  UFCW's members handle 71 percent of all hogs slaughtered and processed in the United States. Members of UFCW Local 663, UFCW Local 440, and UFCW Local 2 are also members of UFCW.

14.     Defendant U.S. Department of Agriculture is an agency of the United States within the meaning of the APA. It is responsible for implementing certain provisions of the FMIA and the Humane Methods of Slaughter Act (HMSA) relevant to this action, and issued the rule at issue in this case.

# FACTS

## *Statutory Background*

15.     In 1906, in response to a crisis of public confidence in the sanitation of the meatpacking industry, President Theodore Roosevelt appointed a special committee to investigate conditions in the industry. That committee's report, referred to as the Neill-Reynolds Report, described unhealthy and dangerous conditions in meatpacking plants and found that these unsafe and unsanitary working conditions made "the health and comfort of the employees … impossible, and the consumer suffers in consequence." H.R. Doc. No. 59-873 at 8 (1906); *see also id.* at 9–10 (finding working conditions were "a constant menace not only to [the workers'] own health, but to the health of those who use the food products prepared by them").

16.     President Roosevelt transmitted the Neill-Reynolds Report to Congress in June 1906, along with a request for the "immediate enactment into law of provisions which will enable the Department of Agriculture adequately to inspect the meat and meat-food products entering into interstate commerce and to supervise the methods of preparing the same, and to prescribe the sanitary conditions under which the work shall be performed." In response, Congress enacted the Federal Meat Inspection Act of 1906, Pub. L. 59-382 (1906), *codified at* 21 U.S.C. §§ 601 *et seq*.

17.     The FMIA, as amended, contains numerous provisions relating to the inspection, processing, and packaging of meat products. The statute requires examination of animals by federal inspectors prior to slaughter, post-mortem, and before entering any slaughtering or packaging establishment. 21 U.S.C. §§ 603–05. The FMIA also establishes requirements for the labeling of meat food products. *Id.* § 607. The FMIA also gives the Secretary of Agriculture the power to regulate meat processing establishments, including the conditions at these plants. *Id.* § 608.

18.     For pre-mortem inspections, the FMIA provides: "the Secretary shall cause to be made, *by inspectors appointed for that purpose*, an examination and inspection of *all* amenable species before they shall be allowed to enter into any slaughtering, packing, meat-canning, rendering, or similar establishment, in which they are to be slaughtered." 21 U.S.C. § 603(a) (emphases added).

19.     For post-mortem inspections, the statute provides that "the Secretary shall cause to be made *by inspectors appointed for that purpose* a post mortem examination and inspection of the carcasses and parts thereof of *all* amenable species to be prepared at any slaughtering, meat-canning, salting, packing, rendering, or similar establishment." *Id.* § 604 (emphases added).

20.     Fifty years after the FMIA was enacted, Congress enacted the Humane Methods of Slaughter Act of 1958, Pub. L. No. 85-765, *codified at* 7 U.S.C. §§ 1901 *et seq.* (HMSA). The HMSA declared a policy of avoiding needless suffering and ensuring that animals were slaughtered only by humane methods. To achieve those goals, it authorized the Secretary to investigate and determine humane methods of slaughter and to designate permissible methods of slaughter and handling of livestock. *Id.* § 1904.

21.     In enacting the HMSA, Congress stated its finding "that the use of humane methods of in the slaughter of livestock … results in safer and better working conditions for persons engaged in the slaughtering industry." 7 U.S.C. § 1901.

***Regulatory Background***

22.     Pursuant to the FMIA and HMSA, the USDA has promulgated regulations concerning the processing and inspection of swine.

23.     Swine slaughtering and processing plants in the U.S. are organized around "lines," which ferry animals through facilities through the various stages of the slaughtering and

disassembling process. The "line speed" refers to lines' rate of operation and is measured in hogs per hour.

24.    For decades, USDA's regulations have recognized the relationship between line speeds and the statutory mandates of the FMIA and HMSA. *See, e.g.*, Consumer & Mktg. Serv., USDA, Final Rule, Revision Pursuant to Wholesome Meat Act, 35 Fed. Reg. 15552, 15562 (Oct. 3, 1970), *codified at* 9 C.F.R. § 307.4 ("All slaughtering of livestock and preparation of products shall be done with reasonable hours, and with reasonable speed, the facilities of the establishment being considered."); USDA, Final Rule, Cattle & Swine Post-Mortem Inspection Procedures & Staffing Standards, 47 Fed. Reg. 33673, 33676 (Aug. 4, 1982), *codified at* 9 C.F.R. § 310.1 ("The inspector in charge shall have the authority to require the establishment to reduce slaughter line speeds where, in his judgment, the inspection procedure cannot be adequately performed at the current line speed.").

25.    For the past thirty-four years, regulations have set a maximum speed for swine slaughter lines. The maximum speed is tied to the number of online, federally-employed inspectors and the type of swine being slaughtered, topping out at a rate 1,106 head per hour for hog slaughter lines, with seven on-line FSIS inspectors. *See* USDA, Final Rule, Swine Post-Mortem Inspection Procedures & Staffing Standards, 50 Fed. Reg. 19900, 19903 (May 13, 1985), *codified at* 9 C.F.R. § 310.1(b)(3).

### *The Experience of Swine Slaughter Workers*

26.    Even with the protections provided by statute and regulation, work in swine slaughter facilities remains very dangerous to workers, including Plaintiffs' members.

27.    Meatpacking workers have the highest rate of occupational illnesses of any private industry in the county. *See* Comments from the National Employment Law Project, Apr. 30, 2018,

FSIS-2016-0017-76250 at 2 (NELP Comments); Comments from the American Public Health Association, Occupational Health & Safety Section, May 1, 2018, FSIS-2016-0017-61127 at 2 (APHA Comments). The Bureau of Labor Statistics has found that meatpacking workers suffer injuries and illnesses at a rate that is 2.3 times higher than the average for all private industries; they suffer occupational illnesses alone at a rate that is more than 17 times higher than the national average for all industries, public and private. NELP Comments at 2 (citing Bureau of Labor Statistics, *Employer-Reported Workplace Injuries and Illnesses (Annual)* (Nov. 8, 2018), https://www.bls.gov/web/osh.supp.toc.htm).

28.     The nature and prevalence of injuries to meatpacking workers is well-documented in the rulemaking record. Many worker injuries are caused by the repetitive forceful nature of the work they perform, which leads to repetitive stress injuries like carpal tunnel syndrome and tendonitis. Studies have repeatedly shown that increased line speed rates lead to increased rates of these injuries due to the increase in the number of repetitive forceful motions required. *See id.*; Comments from UFCW, May 2, 2018, FSIS-2016-0017-8009 at 6–7 (UFCW Comments) (collecting sources); AOEC Comments at 3 (discussing studies); APHA Comments at 4 (same); *see also* GAO Report, Additional Data Needed to Address Continued Hazards in the Meat & Poultry Industry, GAO-16-337 (Apr. 2016), https://www.gao.gov/assets/680/676796.pdf.

29.     Workers are also at significant risk of lacerations or other injuries caused by knives and blades. *See, e.g.*, Perry Comments (collecting studies); NELP Comments at 4 (same). Risk of these injuries also increases when line speeds increase, as workers are placed closer together and/or are using sharp knives more quickly. *Id.*

30.     In light of the high injury rates in the industry, the Occupational Safety and Health Administration (OSHA) has long encouraged plants to adjust line speeds and take other steps to

reduce the number of repetitions per employee in order to decrease worker injury rates. *See, e.g.*, Ergonomics Program Management Guidelines for Meatpacking Plants, Occupational Safety and Health Administration 3123 (1993), https://www.osha.gov/Publications/OSHA3123/3123.html, *cited in* Comments from Public Citizen, May 2, 2018, FSIS-2016-0017-80154, at 4.

31.    OSHA does not regulate line speeds at swine slaughter plants. Only USDA regulates line speeds at those plants.

32.    Swine slaughter workers across the United States have regularly reported extreme pressure to work as fast as possible.

33.    Local 663 members who work on the slaughter lines are regularly diagnosed with carpal tunnel syndrome as a result of the repetitive motions required by their work. They also commonly suffer lacerations, and one recent injury resulted in an amputation. Local 663 members also suffer from knee, back, shoulder, and neck injuries as a result of their work on the slaughter lines in Worthington.

34.    Local 440 members have experienced similar injuries, including lacerations, and many have been diagnosed with cumulative trauma from repetitive motion.

35.    Local 2 workers in both the St. Joseph and Guymon plants frequently suffer from carpal tunnel, back, and shoulder issues as a result of their work on the slaughter lines.

***Proposed Rule***

36.    On February 1, 2018, USDA published in the Federal Register a notice of proposed rulemaking (NPRM) announcing that it intended to amend federal meat inspection regulations for hog slaughter establishments. 83 Fed. Reg. 4780, 4780. The NPRM set a deadline for public comments of April 2, 2018, which was subsequently extend to May 2, 2018.

37.     The main elements of the proposed "New Swine Inspection System" are a revocation of maximum line speeds; a reduction of the number of FSIS online inspectors and their replacement with offline inspectors; and a requirement that plants use their own employees to inspect animals on the line before FSIS ante-mortem inspection and screen out defective and contaminated animals.

38.     When issuing the NPRM, USDA "recognize[d] that evaluation of the effects of line speed on food safety should include the effects of line speed on establishment employee safety." 83 Fed. Reg. at 4796. This was consistent with USDA's historical consideration of the impact of its rules under the FMIA and HMSA on worker safety. USDA thus requested comment on "the effects of faster line speeds on worker safety." *Id*. at 4796. The agency also claimed to have conducted a review of injury rates in the plants that participated in the HAACP-Based Inspection Models Project (HIMP), which served as a model for the proposed rule. *Id.* It claimed that its "preliminary analysis" of 5 HIMP and 24 non-HIMP plants "show[ed] that HIMP establishments had lower mean injury rates than non-HIMP establishments." *Id.* When it issued the NPRM, USDA did not make this analysis, or the underlying data, available to the public.

39.     Both via comments and other communications with USDA, several entities requested that USDA produce its analysis, methodology, and data it relied upon, and extend the comment period, so that interested members of the public could analyze the data themselves and meaningfully comment on it. As one commenter put it, "How can the public comment on a review when there is no study publicly available to review?" Comments from Worksafe, May 1, 2018, FSIS-2016-0017-79029, at 2 (Worksafe Comments).

40.     USDA did not produce the data during the comment period.

11

41.     More than 83,000 comments on the NPRM were submitted to USDA, including multiple comments explicitly addressing the workplace safety implications of the proposed rule. The comments included submissions from occupational health and safety experts. *See, e.g.*, Comments from the National Council for Occupational Safety and Health, May 8, 2018, FSIS-2016-0017-80482 (NCOSH Comments); Perry Comments; APHA Comments; AOEC Comments; Comments from Professor David Michaels, Apr. 30, 2018, FSIS-2016-0017-74002; Comments from the American College of Occupational and Environmental Medicine, Apr. 24, 2018, FSIS-2016-0017-56898; Worksafe Comments.

42.     In addition to stating that USDA had not provided them with sufficient information to comment on the agency's purported "analysis," these comments pointed to a variety of methodologically rigorous, credible scientific studies showing that increased line speeds lead to increased rates of both repetitive stress injuries and lacerations, and that the elimination of line speed caps would increase the risk of harm to workers' lives and safety. *See, e.g.*, Perry Comments; APHA Comments at 3–7; UFCW Comments at 6; NELP Comments.

43.     Several commenters emphasized the harms that reducing the presence of government-trained food inspectors on the lines would cause to worker and food safety. *See* NELP Comments; Comments from Food & Water Watch, May 2, 2018, FSIS-2016-0017-82026 (FWW May 2 Comments).

44.     Several commenters brought to USDA's attention that the NPRM's discussion of the costs and benefits of the proposed rule did not include the costs of worker injuries and illnesses. *See, e.g.*, NELP Comments at 5; Comments from Economic Policy Institute, May 8, 2018, FSIS-2016-0017-75969, at 4 (EPI Comments).

45.    Several commenters wrote that the elimination of maximum line speeds would be contrary to the FMIA, because FSIS inspectors would be unable to conduct the required "critical appraisal" of each hog at increased line speeds—particularly if the number of federal inspectors were significantly cut. They explained that the FMIA and HMSA require inspection of each animal by a FSIS inspector, and a meaningful inspection cannot occur at unlimited line speeds with a reduced number of FSIS inspectors. *See, e.g.*, FWW May 2 Comments at 3; Comments from Government Accountability Project, April 30, 2018, FSIS-2016-0017-82119, at 2 (GAP Comments). These comments explained that plant-employee inspectors do not adequately protect the integrity of the process. *See* FWW May 2 Comments at 33.

***Post-Comment Developments***

46.    Multiple groups submitted Freedom of Information Act (FOIA) requests for USDA's purported worker safety analysis, but USDA did not provide the information before the comment period closed. On September 21, 2018, more than four months after the close of the comment period, FSIS released the materials in response to a FOIA request.

47.    Two experts from Texas State University, one an occupational health expert and one an expert in statistical analysis, analyzed these newly-revealed materials and concluded that it was "impossible for FSIS to draw any statistically valid conclusion about worker injury rate differences in HIMP versus traditional plants" based on the data it studied. Celeste Monforton & Phillip W. Vaughan, *Review of the Analysis Prepared by the Food Safety Inspection Service (USDA/FSIS) of Plant Employee-Injury Rates at Swine Slaughtering Operations*, https://www.nelp.org/wp-content/uploads/Monforton-Vaughan-Review-USDA-FSIS-Injury-Data.pdf. The experts identified three main flaws in USDA's analysis: (1) an insufficient sample

size; (2) a methodology for comparisons that would make "[s]tatisticians [] likely [] to scratch their heads"; and (3) the lack of a truly random sample.

48.     Multiple stakeholders shared these findings and other critiques of USDA's analysis with USDA, and they requested that USDA reopen the rulemaking docket to add the underlying data and analysis, and reopen the comment period so that members of the public could provide comment and potentially conduct more detailed analyses of the raw data.

49.     USDA denied these requests, asserting that a link it provided in connection with the NPRM had been sufficient to allow members of the public to respond to the agency's analysis. That link, however, had contained only aggregate industry-wide data, which did not allow members of the public to do the analysis that USDA purported to do and did not provide information about USDA's methodology in making those comparisons.

50.     Upon the request of 17 members of Congress, the USDA Office of Inspector General (OIG) has launched an investigation into USDA's conduct throughout the rulemaking, including its failure to disclose the data it relied upon in the NPRM and the flawed analysis it undertook.

***Final Rule***

51.     On October 1, 2019, USDA published the final Swine Slaughter Rule in the Federal Register, with an effective date of December 2, 2019. 84 Fed. Reg. at 52300.

52.     Consistent with the NPRM, the final rule eliminated maximum line speed, shifted online inspection responsibility from federal employees to plant employees, and adopted a 40 percent reduction in the number of federal inspectors on each line.

53.     In the preamble to the Rule, USDA addressed its refusal to publish the data and analysis of worker safety on which it relied in the NPRM, stating that "all the information that

FSIS used in its analysis is publicly available." 84 Fed. Reg. 52305. USDA did not acknowledge the point made by commenters that the NPRM did not provide members of the public either sufficient information to determine what publicly available information the purported analysis relied on or sufficient information as to the methodology used.

54.     USDA did not address any of the comments that identified flaws in USDA's analysis of worker safety.

55.     In the Rule, USDA disclaimed reliance on the analysis of worker safety to which it had referred in the NPRM. 84 Fed. Reg. at 52305. Rather, it simply stated that, "while FSIS recognizes that working conditions is an important issue, the Agency does not have authority to regulate issues related to establishment worker safety. OSHA is the federal agency with statutory and regulatory authority to promote workplace safety and health." *Id.*

56.     USDA did not state that it lacked authority to consider the impact of its actions on worker safety.

57.     USDA did not address the connection between worker safety and food safety, which was explicitly noted by several commenters. *See, e.g.*, Comments from Consumer Federation of America, May 2, 2018, FSIS-2016-0017-81413, at 16. USDA did not dispute that connection.

58.     USDA did not acknowledge or explain its reversal of position from the NPRM as to the need to consider the Rule's impact on worker safety, nor did it acknowledge the numerous prior rulemakings in which it considered the impacts of its actions on worker safety.

59.     USDA did not address the detailed comments explaining that it has authority to "regulate" with respect to issues of worker safety, including a legal opinion from the Office of the Solicitor of Labor. *See* Michaels Comments at 2–5, App'x 2, App'x 3.

15

60.     In its preamble discussion in the Rule about the elimination of maximum line speeds, USDA noted the extensive expert evidence in the record that showed that the elimination of line speed maximums would lead to a significantly increased risk of injury to workers. 84 Fed. Reg. at 52314–15. It did not note any contrary studies, though it noted that a single plant owner claimed it had not found a correlation between line speed and worker injury. *Id*.

61.     Rather than address this evidence, USDA's again stated that it lacked authority to regulate worker safety. 84 Fed. Reg. at 52315.

62.     While stating that, under statute, USDA could "solely" consider consumer health and welfare in issuing regulations, 84 Fed. Reg. at 52315, USDA considered other factors, such as "remov[ing] unnecessary regulatory obstacles to industry innovation" for its rule, *see* 84 Fed. Reg. at 52302. *See also id*. at 52312 (citing authority to change regulations to reduce "regulatory burdens on industry"); *id.* at 52319 (making changes from proposed rule in response to "concerns about the regulatory burden").

63.     USDA did not address any of the commenters' suggested modifications to ameliorate the impact of its action on worker safety.

64.     USDA dismissed concerns about the inability of a reduced number of line inspectors to conduct critical appraisals of animals at unlimited speeds by noting that the remaining inspectors would retain authority to slow the line speed. *See* 84 Fed. Reg. at 52312.

65.      USDA did not include in the Rule any training requirement for workers that would take on inspection duties. *See* 84 Fed. Reg. at 52313.

66.     Despite USDA's statement that it "lacks authority" to regulate issues related to worker safety, and its refusal to consider the impact of its actions on worker safety with respect to the elimination of line speeds and the changes to the inspection model, the Rule includes a

requirement that each plant annually submit an "attestation … that it maintains a program to monitor and document any work-related conditions of establishment workers, and that the program includes" various elements. *See* 84 Fed. Reg. at 52315; 52349 (new 9 C.F.R. § 310.27).

67. The Rule's cost-benefit analysis did not consider the costs associated with worker injury. *See* 84 Fed. Reg. at 52338–39.

68. USDA's conclusions that the elimination of maximum line speeds and changes to the inspection model will not negatively impact food safety were not supported by reasoned analysis or evidence in the record.

***Impact of the Rule***

69. In the Rule, USDA stated that it expects forty high-volume establishments to adopt the New Swine Inspection System.

70. The plants in which members of Local 663, Local 440, and Local 2 work are among these forty establishments. Workers at an additional thirteen of these forty plants are members of other UFCW locals.

71. In the Rule, USDA assumed that these forty plants would increase their maximum line speed by 12.49 percent. 84 Fed. Reg. at 52335.

72. The Rule substantially harms Plaintiffs' members by permitting Plaintiffs' employers to increase line speeds without limit, putting their members at substantially increased risk of injury.

73. Plaintiffs' members will also be harmed by the reduction of federal inspectors on the line. Both under the old regime and the new regime, federal inspectors have the authority to order a line speed to be reduced for a variety of reasons. With fewer inspectors observing the lines, inspectors are less likely to observe dangerous conditions and to halt the line when necessary to

protect workers. *See, e.g.*, Christopher Collins, "Under Mindy Brashears' Leadership, USDA Will Let Swine Slaughter Facilities Go Hog Wild," *Texas Observer*, Mar. 26, 2019, https://www.texasobserver.org/under-mindy-brashears-leadership-usda-will-let-swine-slaughter-facilities-go-hog-wild/ (noting interview with HIMP inspector).

## FIRST CAUSE OF ACTION
### (Violation of the APA – Elimination of Line Speed Limits)

74.     USDA's failure to consider overwhelming record evidence that indicates that faster line speeds subject workers to substantially increased risk of injury was arbitrary and capricious. By eliminating limits on line speeds while failing to consider an important aspect of the problem, USDA did not engage in reasoned decisionmaking.

75.     USDA's suggestion that it "lacked authority" to consider harms to workers was incorrect as a matter of law and rendered its decision to eliminate limits on line speeds arbitrary and capricious.

76.     USDA's failure to acknowledge and explain its reversal of position as to its authority to consider harms to workers rendered its decision to eliminate limits on line speeds arbitrary and capricious.

77.     Because USDA's elimination of limits on line speeds is arbitrary and capricious, the Rule should be set aside pursuant to 5 U.S.C. § 706(2)(A).

## SECOND CAUSE OF ACTION
### (Violation of the APA – Reduction of FSIS Inspectors)

78.     The FMIA requires FSIS inspectors to conduct a critical appraisal of each animal on the line.

79.     By reducing the number of on-line agency inspectors by forty percent, while allowing unlimited line speeds, the Rule does not ensure an adequate number of inspectors to conduct the required critical appraisal.

80.     Because USDA's forty percent reduction in the number of inspectors thus violates the FMIA, the Rule should be set aside pursuant to 5 U.S.C. § 706(2)(A).

### THIRD CAUSE OF ACTION
### (Violation of the APA – Reduction of FSIS Inspectors)

81.     USDA failed to provide an adequate rationale for its decision to reduce the number of federal inspectors by forty percent and to replace them with employees.

82.     USDA failed to acknowledge comments explaining the impact of the reduction of federal inspectors on worker safety.

83.     USDA's forty percent reduction in the number of inspectors is arbitrary and capricious, in contravention of the APA, and thus the Rule should be set aside pursuant to 5 U.S.C. § 706(2)(A).

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

(A) Declare that the Rule arbitrary, capricious, and contrary to law;

(B) Set aside the Rule;

(C) Enjoin defendant from implementing the Rule;

(D) Award Plaintiffs their costs and expenses, including reasonable attorney's fees and expert witness fees; and

(E) Grant such other relief as this Court deems just and proper.

Dated: Oct. 7, 2019                     Respectfully submitted,

                                        s/ Timothy J. Louris
                                        Timothy J. Louris (#391244)
                                        MILLER O'BRIEN JENSEN, P.A.
                                        120 South Sixth Street, Suite 2400
                                        Minneapolis, MN 55402
                                        (612) 333-5831
                                        tlouris@mojlaw.com

Adam R. Pulver*
Nandan M. Joshi*
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
apulver@citizen.org

Sarai K. King*
UNITED FOOD & COMMERCIAL
WORKERS INTERNATIONAL UNION,
AFL-CIO, CLC
1775 K Street, NW
Washington, DC 20006-1598
(202) 223-3111
sking@ufcw.org

*Counsel for Plaintiffs*

 *Pro hac vice motions forthcoming*