UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United Food and Commercial Workers
Union, Local No. 663, et al.,

      Plaintiffs,

v.                                      Case No. 19-cv-2660 (JNE/TNL)
                                          ORDER
United States Department of Agriculture,

      Defendant.

Four labor unions filed this lawsuit against the United States Department of
Agriculture ("USDA") to challenge a Food Safety and Inspection Service ("FSIS") rule
that establishes a New Swine Slaughter Inspection System ("NSIS"). The rule reduces the
number of FSIS inspectors on the production line and eliminates line speed limits in
swine slaughterhouses. Alleging that these changes will harm slaughterhouse employees,
Plaintiffs filed this action under the Administrative Procedure Act ("APA"). They argue
that the rule is arbitrary and capricious and violates the statute authorizing FSIS's
oversight of slaughterhouses. USDA moved to dismiss for lack of Article III standing and
failure to state a claim under the APA.

For the reasons stated below, Plaintiffs lack Article III standing to challenge the
rule based on the reduction in FSIS inspectors. Plaintiffs have standing to challenge the
rule for its elimination of line speeds and have stated a claim under the APA on that
basis. Therefore, Defendant's motion is denied with respect to the line speed claim and
granted with respect to the remaining claims.

**BACKGROUND**

The Federal Meat Inspection Act ("FMIA"), 21 U.S.C. §§ 601–94, requires the

FSIS, a subdivision of USDA, to inspect all animals that will become meat products.

FSIS inspectors must first assess all animals prior to slaughter. 21 U.S.C. § 603(a);

Modernization of Swine Slaughter Inspection, 83 Fed. Reg. 4780, 4783 (Feb. 1, 2018)

("Proposed Rule"). Most slaughterhouses voluntarily segregate animals that appear

obviously unfit for consumption, which allows FSIS to inspect only the animals the

facility has deemed appropriate for slaughter. 21 U.S.C. § 604; Proposed Rule, at 4783.

After slaughter, FSIS inspectors assess swine before and after they are sent along the

production line. *Id.* The production line moves carcasses on chains past workers who trim

meat off the animals. Pl. Mem., at 8.

After slaughter but before swine are placed on the line, slaughterhouse workers do

not typically assess the animals to identify and remove correctable defects or to flag

carcasses that should be condemned. *Id.* FSIS inspectors must conduct this time-intensive

sorting, which slows down inspection and leaves less time to inspect apparently healthy

carcasses for invisible defects. *Id.* at 4784–85. Inspectors conduct a visual inspection to

identify signs of condemnable diseases or conditions of the head, viscera, and carcass of

each swine. *Id.*; Compl. ¶ 23.[1] For animals found fit for consumption, FSIS inspectors

---

[1] On this motion to dismiss, the Court will "primarily consider the allegations in the complaint" but will also take into account "matters of public and administrative record referenced in the complaint." *McChesney v. FEC*, 900 F.3d 578, 583 (8th Cir. 2018).

conduct an examination that includes testing for foodborne pathogens, like salmonella. Proposed Rule, at 4783–84.

In 1996, FSIS adopted a new framework of inspection to ensure slaughterhouses produced safe meat products: the Hazard Analysis and Critical Control Point System ("HACCP"). *Id.* at 4780. FSIS then launched a pilot program, the HACCP-Based Inspection Models Project ("HIMP"), that sought to improve problems in meat and poultry slaughterhouses. *Id.* HIMP tried to make inspection more efficient by empowering slaughterhouses to sort swine post-slaughter, giving FSIS inspectors more time to locate foodborne pathogens instead of identifying obviously defective carcasses. *Id.* at 4780–81.

The first HIMP model FSIS proposed did not involve an examination of each animal carcass by FSIS inspectors, which the D.C. Circuit found violated the FMIA. *See Am. Fed'n of Gov't Emps., AFL-CIO v. Glickman* (AFGE I), 215 F.3d 7, 11 (D.C. Cir. 2000). FSIS then modified HIMP to ensure an inspection of each carcass by federal agents, which the court found complied with the FMIA. *Am. Fed'n of Gov't Emps., AFL-CIO v. Glickman* (AFGE II), 284 F.3d 125, 130–31 (D.C. Cir. 2002).

In 2013, the USDA Office of Inspector General ("OIG") audited HIMP and concluded that FSIS had not adequately overseen the program, potentially increasing food safety risks. *See* Proposed Rule, at 4788 n.5 (citing OIG, USDA, Inspection and Enforcement Activities at Swine Slaughter Plants (2013), https://www.usda.gov/oig/webdocs/24601-0001-41.pdf ("OIG Report")). It also found that three of the five HIMP plants had the highest noncompliance records in the industry. *See* OIG Report, at 19. The

Government Accountability Office ("GAO") similarly reviewed HIMP, finding that FSIS had not adequately evaluated it and that it led to faster line speeds, creating food and worker safety concerns. *See* Proposed Rule, at 4788 n.4 (citing GAO, More Disclosure and Data Needed to Clarify Impact of Changes to Poultry and Hog Inspections (2013), https://www.gao.gov/assets/gao-13-775.pdf ("GAO Report")). In response, USDA evaluated the HIMP program but did not address worker safety concerns raised in the GAO report. *See* Proposed Rule, at 4788–89.

In February 2018, USDA published a notice of proposed rulemaking ("NPRM") that proposed an optional program, the NSIS, that would replicate three features tested in the HIMP pilot: (1) requiring slaughterhouses to conduct ante- and post-mortem sorting to remove defective or contaminated animals; (2) reducing the number of FSIS line inspectors, which would allow FSIS to increase offline inspections; and (3) revoking line speed limits and allowing slaughterhouses to set their own speeds. Proposed Rule, at 4781. FSIS sought comments on these features, but also requested comment on the effects the program may have on worker safety. *Id.* at 4796. In the NPRM, FSIS claimed that HIMP facilities had lower worker injury rates but did not release the underlying data that supported this conclusion. *Id.*

On October 1, 2019, FSIS issued a final rule adopting the regulations proposed in the NPRM. Modernization of Swine Slaughter Inspection, 84 Fed. Reg. 52,300 (Oct. 1, 2019) ("Final Rule"). In the preamble to the Final Rule, FSIS addressed concerns raised by labor and public health organizations related to the reduction of line FSIS inspectors. Final Rule, at 52,312. These commenters had noted that by reducing line inspectors, FSIS

would not be able to adequately conduct a "critical appraisal" of all carcasses, as required by the FMIA. *Id.*; *see AFGE I*, 215 F.3d at 11. FSIS responded to these comments by affirming that it would still inspect all animals sold for consumption. Final Rule, at 52,312. It emphasized that it would meet this obligation with fewer inspectors because slaughterhouses would conduct pre-inspection sorting and remove some carcasses from the line, reducing the number of animals needing inspection. *Id.* at 52,312. Additionally, it noted that FSIS would be able to more effectively conduct offline inspections for pathogens because fewer of its agents would be required on the line. *Id.*

　　　Several commenters also addressed the elimination of maximum line speeds. Citing Bureau of Labor Statistics data and studies by the Occupational Safety and Health Administration ("OSHA") and GAO, commenters noted that eliminating the line speed limits would be harmful to workers, increase injury rates, and reduce the quality of meat products. *Id.* FSIS responded by asserting that it had "neither the authority nor the expertise to regulate issues related to establishment worker safety" under the FMIA or the Egg Products Inspection Act, 21 U.S.C. §§ 1301 *et seq. See id.* at 52,315. Instead, FSIS noted that OSHA has the statutory authority to regulate worker safety in slaughterhouses. *Id.* While FSIS agreed that worker safety is important, it stated that it was compelled by law to only regulate food safety, not establishment worker safety. *Id.* Despite this assertion, the Final Rule requires NSIS establishments to submit an annual attestation to the local FSIS safety committee confirming that they have a worker safety program. *Id.* FSIS will forward these attestations to OSHA and work with OSHA to improve worker safety, following the terms of an agreement between the agencies. *See* OSHA,

Memorandum of Understanding Between OSHA and FSIS (Feb. 2, 1994),

https://www.osha.gov/laws-regs/mou/1994-02-04.

Three local labor unions and one international union representing swine

slaughterhouse workers filed this lawsuit under the APA challenging the reduction in

FSIS line inspectors and the elimination of line speed limits. *See* 5 U.S.C. § 706. The

local unions represent workers at four swine processing plants in Minnesota, Iowa,

Missouri, and Oklahoma. *Id.* ¶¶ 10–12. Each plant is one FSIS identified as likely to

increase its line speeds and adopt NSIS. *Id.* For the purposes of cost-benefit analysis,

FSIS assumed that these plants would adopt the optional programs in the Final Rule.

Compl. ¶ 71 (citing Final Rule, at 52,335). The international labor union, the United Food

and Commercial Workers Union, represents 31,000 workers at 17 of the 40 high-volume

establishments FSIS expects to implement NSIS. Compl. ¶ 13.

In this case, the unions argue that the reduction of line inspectors violates the

FMIA and is arbitrary and capricious. Compl. ¶ 78–83. They also argue that eliminating

line speed limits was arbitrary and capricious because FSIS failed to address worker

safety concerns and instead erroneously claimed that it had no authority to consider

worker safety. *Id.* ¶ 77. USDA moved to dismiss the unions' complaint for lack of

jurisdiction and failure to state a claim.

## DISCUSSION

### I.    Article III Standing

USDA argues that Plaintiffs lack standing under Article III to raise the claims

alleged. *See Lujan v. Def. of Wildlife*, 504 U.S. 555, 560–61 (1992). "Standing is

determined as of the commencement of the lawsuit." *Disability Support All. v. Heartwood Enters., LLC*, 885 F.3d 543, 545 (8th Cir. 2018). On a motion to dismiss for lack of Article III standing under Rule 12(b)(1), a party may raise either a facial or factual challenge. *See Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990). On a facial challenge, a court must "accept[] as true all facts alleged in the complaint" and "consider[] only the materials that are necessarily embraced by the pleadings." *Carlsen v. GameStop, Inc.*, 833 F.3d 903, 908 (8th Cir. 2016) (internal quotations omitted) (citing *Trooien v. Mansour*, 608 F.3d 1020, 1026 (8th Cir. 2010)). By contrast, "[i]n a factual attack, the court considers matters outside the pleadings." *Osborn*, 918 F.2d at 729 n.6. USDA raises a facial challenge in this case.

Plaintiffs, four labor unions, claim to have standing in this case on behalf of their members. "An association has standing to sue on behalf of its members when (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Owner-Operator Ind. Drivers Ass'n, Inc. v. U.S. Dep't of Transp.*, 831 F.3d 961, 967 (8th Cir. 2016) (internal quotations omitted). USDA only disputes the first element of this test, arguing that Plaintiffs failed to identify a single member who has standing.

In cases challenging regulatory action, "Article III standing requires a petitioner to have suffered an injury-in-fact that has a causal connection to the challenged agency action and that likely will be redressed by a favorable decision." *Mo. Coal. for Env't v.*

*FERC*, 544 F.3d 955, 957 (8th Cir. 2008). Future injuries can satisfy this requirement if there is "a substantial risk that the harm will occur." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019). The challenged actions must increase the risk of harm to a level that is no longer speculative or hypothetical. *See Shain v. Veneman*, 376 F.3d 815, 818–19 (8th Cir. 2004).

A regulated party can typically establish an adequate causal connection between a challenged regulation and the injury alleged. *See Def. of Wildlife*, 504 U.S. at 561–62. However, when "a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*," the burden is more difficult to meet. *Id.* at 562. In these indirect harm cases, the plaintiff must demonstrate that the regulated entities "will likely react in predictable ways" that cause harm. *Dep't of Commerce*, 139 S. Ct. at 2565; *see, e.g.*, *Ben Oehrleins & Sons & Daughter, Inc. v. Hennepin Cty.*, 115 F.3d 1372, 1379 (8th Cir. 1997) (concluding that consumers suffered indirect economic injuries from a rate increase on trash haulers).

A plaintiff must establish standing "for each claim he seeks to press and for each form of relief that is sought." *Davis v. Fed'l Election Comm'n*, 554 U.S. 724, 734 (2008) (internal quotations omitted). In this case, Plaintiffs raised one claim challenging the line speed increase and two claims challenging the reduction in federal line inspectors. They must establish standing for each regulatory provision they wish to set aside. *See id.*

## A. Line Speeds

Plaintiffs argue that eliminating line speed limits will increase the risk of injury to their members. Citing comments to the Proposed Rule, a GAO report, and OSHA

guidelines, Plaintiffs allege that faster line speeds will substantially increase workers' risk of stress injuries and lacerations. Compl. ¶¶ 28–30. USDA argues that Plaintiffs have failed to name a specific member who faces an increased risk of injury, that slaughterhouses will not necessarily increase line speeds, and that slaughterhouses will likely counteract any potential increase in injury rates with safety-related measures.

Plaintiffs' injury-in-fact is not merely speculative in this case because they rely on "the predictable effect of Government action on the decisions of third parties." *Dept. of Commerce*, 139 S. Ct. at 2566 (2019). In *Department of Commerce*, several states, counties, and cities challenged the federal government's inclusion of a citizenship question on the 2020 census questionnaire. *Id.* at 2563. The challengers predicted that noncitizen households would respond to the census at lower rates and, therefore, states would lose out on federal funds distributed on the basis of state population. *Id.* at 2565–66. Here, Plaintiffs allege that slaughterhouses will increase line speeds above the current maximum. Compl. ¶¶ 69–72. According to the data cited by Plaintiffs, faster line speeds will increase the risk of physical harm to Plaintiffs' members. Compl. ¶¶ 28–30, 41. Therefore, like in the census case, the government action here will cause a predictable reaction by third parties that significantly increases the risk of harm to Plaintiffs' members. *See Dept. of Commerce*, 139 S. Ct. at 2565.

The "predictable reaction" to the FSIS rule is that slaughterhouses will increase line speeds above the current maximum. Compl. ¶¶ 69–72; *Dept. of Commerce*, 139 S. Ct. at 2565. This allegation is supported by FSIS's own findings, comments from the meatpacking industry, and actions that plant operators are taking to implement line speed

increases. In the final rule, FSIS concluded that it anticipates that "40 market hog establishments are expected to choose and implement the NSIS." Final Rule, at 52,322. Comments from meatpacking plant operators endorsed the revocation of the line speed limit.[2] Plaintiffs also alleged that plants have taken steps to begin implementing faster speeds. Compl. ¶¶ 10–12.

Plaintiffs' theory of harm hardly requires speculation: slaughterhouse workers, operating in close quarters and using sharp objects to trim meat from carcasses, will face higher rates of injury when working at faster speeds. *See* Compl. ¶ 29.[3] Comments cited in the complaint discuss several studies, funded by the National Institute for Occupational Safety and Health ("NIOSH"), that identify line speeds as a leading cause for worker lacerations. *See* Compl. ¶ 29 (citing Professor Melissa J. Perry, Comments to Proposed Rule (May 8, 2018), https://www.regulations.gov/document?D=FSIS-2016-0017-83467). Furthermore, Plaintiffs' members' work requires repetitive motions that increase the likelihood of musculoskeletal disorders, like carpal tunnel syndrome. *See* Compl. ¶ 28 (citing GAO, *Additional Data Needed to Address Continued Hazards in the Meat and Poultry Industry* (2016), https://www.gao.gov/assets/680/676796.pdf). These allegations establish an injury-in-fact.

---

[2] *See, e.g.*, Final Rule, at 52,314 (summarizing industry comments); Comments from Michael P. Skahill, Smithfield Foods (May 2, 2018), https://www.regulations.gov/contentStreamer?documentId=FSIS-2016-0017-83035&attachmentNumber=1&contentType=pdf.

[3] On a facial challenge to standing, the Court must accept these allegations as true. *In re SuperValu, Inc.*, 870 F.3d 763, 768 (8th Cir. 2017).

Next, USDA argues that the injury-in-fact alleged is not "fairly traceable" to the Final Rule because the injury "results from the independent action of some third party not before the court." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 42–43 (1976). However, a plaintiff's injury "may be caused through a chain of events having as its origin the challenged action, so long as the outcome is reasonably plausible." *Minn. Fed'n of Teachers v. Randall*, 891 F.2d 1354, 1367–68 (8th Cir. 1989). For example, where a county ordinance charged garbage haulers higher fees at disposal sites, the corresponding fees haulers charged consumers were fairly traceable to the ordinance. *Ben Oehrleins*, 115 F.3d at 1379.

In this case, any line speed increase would have as its origin the removal of the line speed restriction by FSIS. In fact, increasing line speeds is an intended outcome of this rulemaking because USDA predicted $66 million in resulting cost-savings. Final Rule, at 52,341. Although the predictions made for the purposes of cost-benefit analysis alone may not be enough to establish causation, Plaintiffs have also provided corroborating industry statements and actions. *See Bloomberg L.P. v. Commodity Futures Trading Comm'n*, 949 F. Supp. 2d 91, 122 (D.C. Cir. 2013) (noting that an agency's predictions alone cannot establish standing because "predictions are not held to the same standard as the factual basis for a plaintiff's standing to sue"). Therefore, the heightened risk of injury faced by Plaintiffs' members is fairly traceable to the Final Rule.

Plaintiffs' injury is redressable by the remedy they seek: that the Court set aside the Final Rule as it relates to line speed increases. Compl. ¶ 77. If the Court enjoins

USDA from implementing the Final Rule, the preexisting line speed limit would remain in effect and prevent the injuries alleged. *See* 5 U.S.C. § 706(2); 9 C.F.R. § 310.1.

Because Plaintiffs have properly alleged an injury-in-fact caused by USDA that the Court can remedy, they have constitutional standing to challenge the elimination of line speed limits.

### B. Reduction in Federal Inspectors

To establish an injury based on the reduction in federal inspectors, Plaintiffs allege that inspectors will be "less likely to observe dangerous conditions and to halt the line when necessary to protect workers." Compl. ¶ 73. To support this conclusion, Plaintiffs cite an article in the *Texas Observer* and two comments to the Proposed Rule. Compl. ¶¶ 43, 73. But these sources do not support Plaintiffs' claims. The comments from the National Employment Law Project conclude that reducing government inspectors "will increase food safety risks and endanger animal welfare," but do not discuss the effect of fewer inspectors on worker safety.[4] Similarly, the comments from Food & Water Watch discuss worker safety, but only in relation to line speeds.[5] The *Texas Observer* article

---

[4] Christine L. Owens, Exec. Dir., Nat'l Emp't Law Project, Comments to FSIS on Proposed New Swine Slaughter Inspection Rule, at 10 (May 8, 2018), https://www.regulations.gov/contentStreamer?documentId=FSIS-2016-0017-76250&attachmentNumber=1&contentType=pdf.

[5] Wenonah Hauter, Exec. Dir., Food & Water Watch, NSIS Final Comments, (May 2, 2018), https://www.regulations.gov/contentStreamer?documentId=FSIS-2016-0017-82026&attachmentNumber=1&contentType=pdf, 21–24.

includes data that suggests that line speed increases negatively affect worker safety, but does not discuss how a reduction in federal inspectors would harm workers.[6]

Plaintiffs argue that the harms caused by the increased line speeds and inspector reduction are intertwined because inspectors have authority to slow the line. They claim that fewer inspectors will lead to faster lines and therefore increase the risk of injury. If a statute is severable, a plaintiff must establish standing with respect to each challenged provision. *See Advantage Media, L.L.C. v. City of Eden Prairie*, 456 F.3d 793, 801 (8th Cir. 2006). This suggests, Plaintiffs argue, that the inverse is true: when a law is not severable, the harms caused by the law's provisions need not be analyzed individually for standing purposes.[7]

Contrary to Plaintiffs' theory, "standing is not dispensed in gross" and must be proven for each claim and each form of relief sought. *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996). This is because a federal court's authority to grant a remedy is limited to the scope of a plaintiff's injury. *Smith v. Ark. Dept. of Correction*, 103 F.3d 637, 646 (8th Cir. 1996). "If the right to complain of *one* administrative deficiency automatically conferred the right to complain of *all* administrative deficiencies, any citizen aggrieved in one respect could bring the whole structure of state administration before the courts for

---

[6] *See* Christopher Collins, *Under Mindy Brashears' Leadership, USDA Will Let Swine Slaughter Facilities Go Hog Wild* (Mar. 26, 2019), https://www.texasobserver.org/under-mindy-brashears-leadership-usda-will-let-swine-slaughter-facilities-go-hog-wild/.

[7] The only case Plaintiffs cite for this proposition deals with a different question: whether third-party intervenors have standing to *defend* a regulation on the government's behalf. *See Cal. Ass'n of Private Postsecondary Sch. v. DeVos*, Civil Action no. 17-999 (RDM), 2019 WL 6117418, at *1 (D.D.C. Nov. 18, 2019). In that case, because the rule was allegedly non-severable, and the intervenors would suffer an injury if the rule was invalidated, they had standing to intervene. *Id.* at *6.

review." *Lewis*, 518 U.S. at 358 n.6; *see Davis v. Fed'l Elec. Comm'n*, 554 U.S. 724, 734 (2008) (noting that a plaintiff with standing to challenge one statutory subsection does not necessarily have standing to challenge a separate subsection of the same statute).

In this case, Plaintiffs have established an injury related to the elimination of line speed limits, codified at 9 C.F.R. § 310.26(c), but have not established an injury related to the reduction in federal inspectors, codified at 9 C.F.R. § 310.1(b)(3). Although Plaintiffs are challenging the Final Rule that contains both regulatory changes, the Court only has jurisdiction over the claims for which Plaintiffs have alleged an injury. *See Sierra Club v. EPA*, 873 F.3d 946, 951 (D.C. Cir. 2017) (analyzing standing for each provision of the challenged regulatory guidance). Because Plaintiffs lack standing for the two claims related to the inspector reduction, the Court will dismiss those claims without prejudice. *See Dalton v. NPC Int'l, Inc.*, 932 F.3d 693, 696 (8th Cir. 2019).

## II.     Zone-of-Interests Test

USDA argues that Plaintiffs' claims fail the zone-of-interests test, a requirement for APA claims that measures whether Plaintiffs' injuries are arguably of the kind protected by the statute in question. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014). To bring an APA challenge, a plaintiff's asserted interests must be "arguably within the zone of interests to be protected or regulated by the statute that he says was violated." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) (internal quotations omitted). A statute's zone of interests is determined "not by reference to the overall purpose of the Act in question" but by "the particular provision of law upon which the plaintiff relies." *Bennett v. Spear*,

520 U.S. 154, 175–76 (1997). The test is "not meant to be especially demanding." *Match-E-Be-Nash-She-Wish Band*, 567 U.S. at 225. When identifying a statute's zone of interests, courts use traditional tools of statutory interpretation, look to the statute's context and purpose, and consider relevant agency regulations. *See, e.g. id.* at 225–26; *Lexmark Int'l, Inc.*, 572 U.S. at 127; *Friends of the Boundary Waters Wilderness v. Dombeck*, 164 F.3d 1115, 1126 (8th Cir. 1999).

When applying the zone-of-interests test, "there does not have to be an indication of congressional purpose to benefit the would-be plaintiff." *Nat'l Credit Union Admin. ("NCUA") v. First Nat'l Bank & Tr. Co.*, 522 U.S. 479, 492 (1998). For example, in *NCUA*, the Court found that a statute that limited federal credit union membership to groups with a common associational or geographic bond allowed commercial bank competitors to sue under the APA. *Id.* at 492–94. Although nothing in the relevant statute mentioned commercial banks, by limiting credit union membership to certain groups, the statute implicated the competitive interests of all banks. *Id.*

FSIS cited the entire FMIA as authorization for the challenged regulations. *See* 9 C.F.R. §§ 309–10; Final Rule, at 52,345–46. The stated purpose of the FMIA is to protect "the health and welfare of consumers." 21 U.S.C. § 602. The statutory provisions that authorize federal inspection of slaughterhouses seek to protect consumers from adulterated meat products. *Id.* § 603(a). The Humane Methods of Slaughter Act (HMSA), amended this statutory scheme to prevent "inhumane slaughtering of livestock." *Id.* § 603(b); HMSA, Pub. L. No. 95–445, 92 Stat. 1069 (1978). The HMSA was passed, in

part, to create "safer and better working conditions for persons engaged in the slaughtering industry." 7 U.S.C. § 1901.

FSIS did not establish line speed limits for safety purposes but to facilitate federal inspection. Swine Post-Mortem Inspection Staffing Standards, 46 Fed. Reg. 43,406, 43,409 (July 14, 1981). The speeds were adopted in response to a FSIS staffing shortage and allowed the FSIS to better predict how many inspectors would be needed at each slaughterhouse. *Id.* FSIS established the speed limits by measuring how long it would take an inspector to walk the line and perform the necessary inspections. Cattle and Swine Post-Mortem Inspection Procedures and Staffing Standards, 47 Fed. Reg. 33,673, 33,676 (Aug. 4, 1982).

FSIS has recognized the importance of worker safety by partnering with OSHA and adopting safety attestation requirements. *See, e.g.*, Proposed Rule, at 4796 ("FSIS recognizes that evaluation of the effects of line speed on food safety should include the effects of line speed on establishment employee safety."); Final Rule, at 52,315 (establishing a safety reporting process). Additionally, in a 1994 agreement with OSHA, FSIS agreed to establish processes to "train FSIS meat and poultry inspection personnel to improve their ability to recognize serious workplace hazards." Memorandum of Understanding Between OSHA and FSIS (Feb. 4, 1994), https://www.osha.gov/laws-regs/mou/1994-02-04. One of the objectives set by OSHA and FSIS was to train FSIS to better "recognize and refer to FSIS headquarters those instances where plant employees are exposed to serious workplace hazards." *Id.*

Although worker safety is not directly addressed in the FMIA, worker conditions in slaughterhouses are arguably related to food safety. *See NCUA*, 522 U.S. at 492 (noting that a statute need not directly address a plaintiff's interest). The workers who trim and package meat are an integral part of ensuring that the packaged food is safe. By creating a scheme of federal meat inspection, the FMIA regulates slaughterhouses and, in turn, their employees. If the conditions for the employees are not safe and sanitary, the safety of the food products they prepare is also at risk. FSIS's safety attestation requirement acknowledges this connection between food safety and workplace conditions. Final Rule, at 52,315. Therefore, Plaintiffs' interests are arguably among those protected by the FMIA.

## III.    Failure to State a Claim

USDA argues that Plaintiffs' remaining claim, which alleges that the line speed limit elimination was arbitrary and capricious under the APA, should be dismissed under Rule 12(b)(6). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint "does not need detailed factual allegations," but it must contain "more than labels and conclusions." *Twombly*, 550 U.S. at 555 (citation omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. In short, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

To survive USDA's Rule 12(b)(6) motion, Plaintiffs' complaint must allege that the Final Rule was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2). An agency action is arbitrary and capricious under the APA if "the agency relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *In re Operation of Mo. River Sys. Litig.*, 421 F.3d 618, 628 (8th Cir. 2005). "If an agency's determination is supportable on any rational basis, [the court] must uphold it." *Id.*

When evaluating an agency's decision, courts should evaluate the administrative record and not provide alternative rationales. *See Citizens Telecomms. Co. of Minn., LLC v. FCC*, 901 F.3d 991, 1001 (8th Cir. 2018). "A court is not to ask whether a regulatory decision is the best one possible or even whether it is better than the alternatives." *FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 782 (2016). Instead, a court must "ask whether the agency 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Citizens Telecomms. Co.*, 901 F.3d at 1000 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). A court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Motor Vehicles Mfrs. Ass'n*, 463 U.S. at 43.

When an agency changes its prior policy position, it typically must explain why. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("[T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position."). An agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better*," it simply needs to provide a rational basis for the change. *Id; see Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016). As long as the agency weighed the evidence and considered relevant factors, it is entitled to make policy choices as it sees fit. *See Dep't of Commerce*, 139 S. Ct. at 2571.

Plaintiffs argue the elimination of line speed limits was arbitrary and capricious because FSIS reversed its previous position without acknowledging that reversal and failed to respond to comments identifying safety concerns. In the Final Rule, FSIS responded to concerns about the rule's effect on worker safety by claiming that it had "neither the authority nor the expertise to regulate issues related to establishment worker safety." Final Rule, at 52,315. Asserting a narrow reading of its own statutory authority, FSIS concluded that its enabling acts "authorize FSIS to administer and enforce laws and regulations solely to protect the health and welfare of consumers." *Id.* FSIS elaborated that because OSHA has the authority and expertise to address safety, it would rely on that agency to address any potential safety issues. *Id.*

FSIS reversed its previous position on its ability to consider worker safety during this rulemaking. In a prior rulemaking related to line speeds in poultry slaughterhouses, FSIS devoted five pages of the Federal Register to assess the effects of line speeds on

worker health and safety. Modernization of Poultry Slaughter Inspection, 79 Fed. Reg. 49,565, 49,596–600 (Aug. 21, 2014). During that process, FSIS collaborated with NIOSH and OSHA. *Id.* at 49,596. FSIS addressed safety concerns by requiring all slaughterhouses to file an attestation about work-related conditions. *Id.* at 49,600. FSIS would collect these attestations and forward them to OSHA. *Id.*

In the Proposed Rule in this case, FSIS similarly discussed the relationship between line speeds and worker safety. Proposed Rule, at 4796. After recognizing "that evaluation of the effects of line speed on food safety should include the effects of line speed on establishment employee safety," FSIS suggested that slaughterhouses in the HIMP pilot had lower injury rates. *Id.* It looked at several data points to note that the HIMP plants had lower injury rates, on average, in three types of OSHA injury rate measurements. *Id.*

FSIS not only discussed worker safety, it expressly solicited comments on the issue: "FSIS is requesting comments on the effects of faster line speeds on worker safety." *Id.* It asked the public to comment "on whether line speeds for the NSIS should be set at the current regulatory limit of 1,106 hph or some other number." *Id.* It further noted that it would be interested in records or studies that contain data that OSHA could use in assessing the effects of line speed on worker safety. *Id.*

In the Final Rule, FSIS changed this position by declaring that because it lacked the authority and expertise to regulate worker safety, it would not consider the comments it solicited. *See* Final Rule, at 52,315. It did not acknowledge that it had previously requested specific comments on the topic or reference the data it cited in the Proposed

Rule. *Id.* Rather, it simply asserted, in a conclusory fashion, that it had no legal authority to regulate safety. *Id.* As the D.C. Circuit recently noted, "[n]odding to concerns raised by commenters only to dismiss them in a conclusory manner is not a hallmark of reasoned decisionmaking." *Gresham v. Azar*, 950 F.3d. 93, 103 (D.C. Cir. 2020).

Furthermore, FSIS's explanation for its decision to disregard safety-related comments is internally inconsistent within the Final Rule. Despite explaining that it lacks any authority to regulate slaughterhouse worker safety, FSIS established a new safety-related attestation requirement. Final Rule, at 52,315; *see* 9 C.F.R. § 310.27. The requirement mandates that any facility operating under the NSIS submit an annual attestation "to the management member of the local FSIS circuit safety committee stating that the establishment maintains a program to monitor and document any work-related conditions of establishment workers." Final Rule, at 52,315. Although FSIS noted that it would not be responsible for assessing the merits of these attestations and that it would simply forward them to OSHA, FSIS adopted this requirement pursuant to its authority under the FMIA. *See* Final Rule, at 52,346 (citing 21 U.S.C. §§ 601–95 and 7 C.F.R. § 2.18, 2.53 as authority for the regulations containing the attestation requirements).

FSIS cannot both lack authority to consider worker safety and hold authority to enact safety-related requirements. This internal inconsistency suggests that FSIS engaged in arbitrary decision-making. *See, e.g.*, *Sierra Club v. EPA*, 939 F.3d 649, 664 n.76 (5th Cir. 2019)  (finding an agency decision with internally inconsistent reasoning arbitrary and capricious); *ANR Storage Co. v. FERC*, 904 F.3d 1020, 1026 (D.C. Cir. 2018) (same); *U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 650 (D.C. Cir. 2016) (collecting cases).

FSIS's failure to recognize that inconsistency and explain its reasoning renders its decision to disregard worker safety arbitrary and capricious. *See Dep't of Commerce*, 139 S. Ct. at 2569 (noting that an agency must articulate an explanation for its decisions).

USDA argues that because it had no authority to regulate worker safety under the relevant statutes, it reasonably answered the safety-related comments by stating that it had no authority to regulate worker safety. This circular logic fails to provide a reasonable explanation. As USDA acknowledged in its briefing, it could consider the effects its regulations would have on worker safety even if it had no authority to directly regulate workers. *See* Def. Reply, at 20–21.[8] In other words, the question of whether FSIS has the authority or expertise to directly regulate worker safety does not determine whether FSIS is forbidden from considering the collateral effects its rulemaking might have on workers. Therefore, FSIS's stated reason for declining to consider those collateral effects was not a rational explanation.

As USDA correctly points out, if the scope of an agency's statutory authority is ambiguous, the agency's reasonable interpretation of its own authority is entitled to deference. *See City of Arlington v. FCC*, 569 U.S. 290, 301 (2013). However, because the agency's interpretation of its statutory authority with respect to worker safety does not answer the ultimate question in this case, the Court need not determine whether the agency's conclusion was correct or whether its interpretation is entitled to deference. Here, the only issue before the Court is whether FSIS's decision to disregard the rule's

---

[8] This litigation position is consistent with FSIS's call for comments and its decision to create a safety-related attestation. Proposed Rule, at 4796; Final Rule, at 52,315.

effects on worker safety was adequately justified. For the reasons discussed above,

Plaintiffs have properly alleged that it was not.

## CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated

above, IT IS ORDERED THAT:

1. Defendant's Motion to Dismiss [ECF No. 14] is GRANTED IN PART and DENIED IN PART.

2. Count 2 of Plaintiffs' Complaint is DISMISSED WITHOUT PREJUDICE.

3. Count 3 of Plaintiffs' Complaint is DISMISSED WITHOUT PREJUDICE.

Dated: April 1, 2020

s/ Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge