UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

UNITED FOOD AND COMMERCIAL
WORKERS UNION, LOCAL No. 663, *et al.*,

                      Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
AGRICULTURE,

                      Defendant.

Civil Action No. 0:19-cv-02660
The Honorable Joan N. Ericksen
Magistrate Judge Tony N. Leung

**REPLY IN SUPPORT OF
DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

# **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

ARGUMENT ..........................................................................................................................2

    I.       Plaintiffs Lack Article III Standing. ...........................................................................2

           A.       The Nine Identified Individuals Who Work at Non-NSIS Establishments Would Not Have Individual Standing to Bring This Lawsuit. ............................3

           B.       The Lone Identified Individual Who Works at an NSIS Establishment Would Not Have Individual Standing to Bring This Lawsuit. ............................4

           C.       The Alleged Injury Is Not Fairly Traceable to the Final Rule. ............................5

    II.      FSIS's Revocation of Evisceration-Line Speed Limits Was Not Arbitrary or Capricious. ..................................................................................................................6

           A.       FSIS Did Not Change Its Position in Adopting the Final Rule. ..........................6

           B.       FSIS Adequately Addressed the Final Rule's Potential Effects on Worker Safety. ...................................................................................................................7

           C.       The Final Rule Is Internally Consistent. ..................................................................9

    III.     If the Court Grants Plaintiffs' Motion, Vacatur of the Entire Final Rule Would Be Innappropriate. ......................................................................................................10

CONCLUSION ....................................................................................................................13

## TABLE OF AUTHORITIES

**Cases**

*Aera Energy LLC v. FERC*,
   789 F.3d 184 (D.C. Cir. 2015) ...................................................................................... 8

*Am. Fed'n of Labor & Cong. of Indus. Orgs. v. NLRB*,
   No. 20-cv-0675, 2020 WL 3041384 (D.D.C. June 7, 2020) ....................................... 13

*Barakat v. Fisher*,
   No. 13-cv-1296, 2013 WL 6058932 (D. Minn. Nov. 18, 2013) ................................... 6

*DHS v. Regents of University of California*,
   140 S. Ct. 1891 (2020) .......................................................................................... 1, 11

*Food & Water Watch, Inc. v. Vilsack*,
   808 F.3d 905 (D.C. Cir. 2015) ...................................................................................... 2

*Gill v. Whitford*,
   138 S. Ct. 1916 (2018) ................................................................................................ 13

*GS New Mkts. Fund, LLC v. U.S. Dep't of Treasury*,
   407 F. Supp. 2d 21 (D.D.C. 2005) ................................................................................ 8

*La. Fed. Land Bank Ass'n, FLCA v. Farm Credit Admin.*,
   336 F.3d 1075 (D.C. Cir. 2003) .................................................................................. 10

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ................................................................................................ 5, 6

*NAACP v. Trump*,
   298 F. Supp. 3d 209 (D.D.C. 2018) ............................................................................ 11

*Nat'l Family Farm Coal. v. EPA*,
   966 F.3d 893 (9th Cir. 2020) ...................................................................................... 12

*Ouachita Watch League v. U.S. Forest Serv.*,
   858 F.3d 539 (8th Cir. 2017) ........................................................................................ 2

*Pollinator Stewardship Council v. EPA*,
   806 F.3d 520 (9th Cir. 2015) ................................................................................ 10, 12

*Simon v. E. Ky. Welfare Rights Org.*,
   426 U.S. 26 (1976) ........................................................................................................ 6

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ............................................................................................................2

**Regulations**

79 Fed. Reg. 49,566............................................................................................................................3

84 Fed. Reg. 52,300................................................................................................................ *passim*

**INTRODUCTION**

Plaintiffs lack associational standing because none of the ten members they have identified would have individual standing. Nine of the ten do not face an imminent injury because they work at non-NSIS slaughter establishments. Even assuming their employers will someday convert to NSIS, it is speculative whether that conversion would require these individuals to perform dangerous tasks more quickly or in closer proximity to other workers. The one identified member who currently works at an NSIS establishment does not work on the evisceration line and has not explained how his employer's conversion to NSIS substantially increased his risk of injury. Moreover, the alleged injuries are not traceable to the Final Rule, but to establishments' voluntary operational decisions.

If the Court reaches the merits, it should grant summary judgment to USDA. FSIS decided to eliminate evisceration-line speed limits in NSIS establishments because they are not necessary to protect food safety and because FSIS lacks authority to require actions that relate solely to worker safety. This decision was reasonable and consistent with FSIS's longstanding interpretation of its regulatory authority, as reflected by a legal memorandum in the administrative record.

If the Court finds that FSIS inadequately explained its decision or failed to consider a relevant factor, it should remand the Final Rule without vacatur. Both *Allied-Signal* factors weigh in favor of this remedy: (1) FSIS could almost certainly readopt the challenged policy by taking new agency action on remand; and (2) an interim vacatur would have serious disruptive consequences for FSIS, slaughter establishments, and their employees. There is no merit to Plaintiffs' suggestion that *DHS v. Regents of University of California*, 140 S. Ct. 1891

(2020), altered the longstanding *Allied-Signal* test. Finally, vacatur of the entire Final Rule is inappropriate because partial vacatur limited to the line-speed provision would fully redress Plaintiffs' alleged injuries.

## ARGUMENT

### I. Plaintiffs Lack Article III Standing.

Plaintiffs' opposition brief mischaracterizes the standing inquiry in two ways. First, Plaintiffs assert that they can establish associational standing based on alleged injuries to unidentified members. *See* Pls.' Opp. at 4 n.2, ECF No. 107 (quoting dicta from an out-of-circuit case). Under Supreme Court and Eighth Circuit precedent, however, Plaintiffs' burden at the summary-judgment stage is to demonstrate that the Final Rule has caused "at least one identified member" an injury that would give him or her individual standing to bring this suit. *Summers v. Earth Island Inst.*, 555 U.S. 488 (2009); *accord Ouachita Watch League v. U.S. Forest Serv.*, 858 F.3d 539, 542–44 (8th Cir. 2017).

Second, Plaintiffs suggest that they need not show the Final Rule "substantially increase[s]" at least one identified member's risk of harm. Pls.' Opp. at 9; *see id.* at 7–10. Yet Plaintiffs simultaneously acknowledge that they "must show a 'substantial risk' that one or more of their members will suffer injury *as a result of FSIS's elimination of line speed maximums*" for NSIS establishments. *Id.* at 3 (emphasis added). Accordingly, they must show that the Final Rule substantially increases an identified member's risk compared to the undisputedly high baseline level of risk under the traditional inspection system. *See Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 915 (D.C. Cir. 2015). As detailed below, Plaintiffs have not carried this burden.

### A. The Nine Identified Individuals Who Work at Non-NSIS Establishments Would Not Have Individual Standing to Bring This Lawsuit.

Plaintiffs have identified ten of their members, nine of whom work at establishments that have indicated a desire to transition to NSIS in the future. *See* Pls.' Br. at 21, ECF No. 69 (identifying six individuals); Pls.' Opp. at 5 (identifying four more). Plaintiffs allege that such transitions would increase these nine individuals' "risk of lacerations or other injuries caused by knives and blades," as they (and other workers) would be "placed closer together and/or [would be] using sharp knives more quickly." Pls.' Br. at 10; *accord* Pls.' Opp. at 7.

Although some of these individuals work on evisceration lines, it is speculative whether they will be placed closer to other workers, if and when the establishments where they work transition to NSIS. As USDA has explained, establishments "typically reconfigure their evisceration lines" when transitioning to NSIS, which "may provide more space for each worker on the evisceration line than . . . under the traditional inspection system." Sidrak Decl. ¶ 11, ECF No. 90. It is also speculative whether these individuals will need to perform dangerous tasks more quickly after any future transition to NSIS, because work pace is not directly correlated with evisceration-line speeds, but rather depends on "factors such as staffing levels, plant layout, and product flow." 79 Fed. Reg. 49,566, 49,598, AR 100095; *see* 84 Fed. Reg. 52,300, 52,305, AR 100198.

Perhaps recognizing this, Plaintiffs' most recent filing states "that 'increasing line speed,' *not 'increasing work pace,'* increases the risk of injury to workers." Pls.' Opp. at 11 (emphasis added). But this is flatly inconsistent with the theory of injury Plaintiffs have espoused throughout this litigation. *See, e.g.*, Pls.' Br. at 20–21 (asserting that workers "will face higher rates of injury *when working at faster speeds*") (emphasis added); Pls.' Mem. Opp.

3

Def.'s Mot. Dismiss at 14–15, ECF No. 21; Compl. ¶¶ 29–30, ECF No. 1.  It is also unsupported by the public comments Plaintiffs cite, which argue that increased line speeds are dangerous *because* they increase work pace.  *See, e.g.*, Comment from Melissa Perry, AR 96948 (asserting that the "rapid pace of the work" in slaughter establishments creates risk of injury).

Plaintiffs further err in suggesting that they have standing because "[n]othing in the challenged rule . . . *requires*" establishments to maintain existing work pace and worker spacing when they transition to NSIS.  Pls.' Opp. at 7–8 (emphasis added).  It is not USDA's burden to show that establishments are forbidden from increasing work pace or diminishing worker spacing when converting to NSIS.  Rather, it is Plaintiffs' burden to identify a specific individual who will be forced to perform a dangerous task more quickly, or in closer proximity to other workers, as a result of the Final Rule.  Plaintiffs have not carried that burden.

> **B.     The Lone Identified Individual Who Works at an NSIS Establishment Would Not Have Individual Standing to Bring This Lawsuit.**

Although Plaintiffs assertedly represent approximately 2,000 workers at the Seaboard Foods establishment in Guymon, Oklahoma, which converted to NSIS nearly six months ago, they have identified only one such worker who alleges an injury.  *See* Pls.' Opp. at 4–5; Rosas Decl. ¶ 4, ECF No. 73.  This individual, Jose Quinonez, is a "tongue X-ray operator." Quinonez Decl. ¶ 9, ECF No. 72.  In that role, he "stand[s] next to the X-ray" machine to examine swine tongues for impurities and then, seated at a table, uses a knife to remove such impurities.  *Id.* ¶¶ 9–10.  He does not allege that the transition to NSIS has increased his proximity to other workers or his risk of suffering lacerations.  While he does allege experiencing "pain in [his] hands from the repetitive motion" of removing impurities from tongues, *id.* ¶ 11, he fails to explain how the Guymon establishment's conversion to NSIS

4

substantially increased his risk of experiencing such discomfort.

For one thing, X-raying swine tongues is not part of the swine evisceration process, so it is unclear why increased evisceration-line speeds would increase the pace at which Quinonez must X-ray and remove impurities from tongues. And even if evisceration-line speeds affected the X-ray station, Quinonez's knife usage rate would still depend on the number of other workers engaged in the task—which undisputedly fluctuates and FSIS has never regulated. Moreover, Quinonez's claim that the Guymon establishment "did not change hours or hire more workers" when it converted to NSIS, Quinonez Decl. ¶ 14, has been refuted by the establishment's Senior Vice President of Operations, *see* Summerlin Decl. ¶ 5, ECF No. 104-3 ("To accommodate the increased line speeds under the NSIS rule, the Guymon facility increased its staffing . . . by 22 people (11 each shift)."). Accordingly, Quinonez would not have individual standing to bring this lawsuit.

### C. The Alleged Injury Is Not Fairly Traceable to the Final Rule.

Even if Plaintiffs had carried their burden of demonstrating a substantially increased risk of future injury to an identified member, they would be unable to establish traceability. Plaintiffs' opposition does not dispute that traceability is "substantially more difficult to establish" here because the alleged injuries result from "the independent action of [a] third party not before the court," i.e., slaughter establishments' decisions about whether to adopt NSIS and how to implement it. *See* Def.'s Br. at 16, ECF No. 89 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560, 562 (1992)). Nor does Plaintiffs' opposition reassert the erroneous claim that increased work pace is "the predictable effect" of the Final Rule. *Compare* Pls.' Br. at 22–23, *with* Def.'s Br. at 16–17.

Instead, Plaintiffs suggest that the establishments' allegedly injurious conduct "would have been illegal" if FSIS had not promulgated the Final Rule. Pls.' Opp. at 10 (quoting *Simon v. E. Ky. Welfare Rights Org.,* 426 U.S. 26, 45 n.25 (1976)). This argument fails because the allegedly injurious conduct is not increased evisceration-line speed—which, in isolation, says practically nothing about the risk of worker injury—but rather increased work pace and diminished worker spacing. *See supra* pp. 3–4; *see also* Def.'s Br. at 4, 7, 14–15. The Final Rule does not legalize this conduct; under both NSIS and the traditional inspection system, slaughter establishments are free to determine the pace at which their employees work and their proximity to other workers. *See* Def.'s Br. at 16–17.

In sum, at the motion-to-dismiss stage this Court was required to accept Plaintiffs' allegations that the Final Rule will increase work pace and diminish worker spacing, *see* April 1 Order at 10 & n.3, ECF No. 30, but it should now dismiss the case because Plaintiffs have not supported those allegations "with the manner and degree of evidence required at [the summary-judgment] stage[]," *Lujan*, 504 U.S. at 561.

## II. FSIS's Revocation of Evisceration-Line Speed Limits Was Not Arbitrary or Capricious.

If the Court reaches the merits of Plaintiffs' claim, it should uphold the Final Rule's revocation of evisceration-line speed limits under the APA's "highly deferential" standard of review. *Barakat v. Fisher*, No. 13-cv-1296, 2013 WL 6058932, at *11 (D. Minn. Nov. 18, 2013) (Ericksen, J.).

### A.  FSIS Did Not Change Its Position in Adopting the Final Rule.

As explained in USDA's opening brief, FSIS's longstanding position is that it lacks statutory authority to regulate worker safety, but may consider worker safety when

6

promulgating food-safety regulations. *See* Def.'s Br. at 19–21. Plaintiffs' assertion that the Final Rule represents "an unexplained departure from [this] prior position[]" rests on the incorrect premise that FSIS did not consider worker safety when it adopted the Final Rule. *See* Pls.' Opp. 12–13. Nowhere in the Final Rule did FSIS disavow its authority to consider worker safety; to the contrary, it expressly considered worker safety throughout the rulemaking process and adopted a safety-related attestation requirement. *See* Def.'s Br. at 21 (citing 84 Fed. Reg. at 52,315, AR 100208). While Plaintiffs believe that the Final Rule should have contained more discussion of worker safety, it is clear that FSIS *considered* the issue, and therefore never changed its position.

### B. FSIS Adequately Addressed the Final Rule's Potential Effects on Worker Safety.

In the Final Rule, FSIS explained that it revoked evisceration-line speed limits because they "are not necessary" to ensure adequate food-safety inspections in NSIS establishments, and it "has neither the authority nor the expertise to regulate issues related to establishment worker safety." 84 Fed. Reg. at 52,314–15, AR 100207–100208. The administrative record provides further detail about FSIS's reasoning: Per a memorandum from USDA's Office of General Counsel, FSIS may consider worker safety in the context of a rulemaking and may adopt limited, collaborative measures to support other federal agencies' regulation of worker safety, but it may not "require actions that . . . relate solely to worker safety." Legal Opinion Regarding USDA's Lack of Authority to Promulgate Regulatory Requirements Related Solely to Poultry Plant Workers' Safety" (March 15, 2013), AR 103198–103208 ("OGC Memo"). Based on this interpretation of its regulatory authority, FSIS determined that it could not impose evisceration-line speed limits on NSIS establishments solely because of a potential

7

benefit to worker safety. *See* 84 Fed. Reg. at 52,315, AR 100208.

There is no merit to Plaintiffs' assertion that this argument is a "post-hoc rationalization[] of [litigation] counsel," Pls.' Opp. at 14. The agency articulated the argument well before adopting the Final Rule, in the context of declining to adopt measures related solely to workers' safety in the New Poultry Inspection System ("NPIS") rulemaking. *See* OGC Memo. Plaintiffs would have the Court ignore the OGC Memo's existence—as their opposition brief does—but the Court's role is to "discern the agency's decision-making process from the record." *GS New Mkts. Fund, LLC v. U.S. Dep't of Treasury*, 407 F. Supp. 2d 21, 24 (D.D.C. 2005); *see, e.g.*, *Aera Energy LLC v. FERC*, 789 F.3d 184, 193 (D.C. Cir. 2015). The OGC Memo is undisputedly part of the administrative record, and it makes readily apparent that FSIS declined to impose line-speed requirements on NSIS establishments because it lacks authority to do so without a "clear nexus" to food safety. AR 103206; *see* 84 Fed. Reg. at 52,314–15, AR 100207–100208. Accordingly, the explanation set forth in USDA's opening brief is properly before the Court.

This explanation provides "a reasonable basis" for FSIS's decision to eliminate evisceration-line speed limits for NSIS establishments, and therefore survives highly deferential APA review. In response, Plaintiffs reiterate their erroneous assertion that FSIS did not consider worker safety when promulgating the Final Rule. *See* Pls.' Opp. at 15–16. Again, FSIS *did* consider worker safety; it solicited comments on the topic, considered them, and adopted the same safety-related requirement it adopted in the final NPIS rule. *See* Def.'s Br. at 21.

Plaintiffs also suggest that USDA's position is unreasonable because it would have required FSIS to rescind line-speed limits "even if undisputed evidence showed it would cause the deaths of 100,000 plant workers." Pls.' Opp. at 17. Not so; had such evidence existed, FSIS would have immediately informed OSHA and supported its efforts to prevent such a catastrophe. Plaintiffs' hypothetical scenario is far afield from this case, however. OSHA has determined that capping line speeds alone would not meaningfully combat the high incidence of musculoskeletal injuries among slaughter establishment workers, and has declined to impose such limits for that reason. AR 103220–10322. And, based on the HIMP pilot, FSIS determined that NSIS establishments would only modestly increase their line speeds, 84 Fed. Reg. at 52,335, AR 100228, and would manage the higher speeds "through increased staffing and automation," AR 103199. Under these circumstances, FSIS's decision to revoke maximum evisceration-line speeds for NSIS establishments because of limits on its regulatory authority, and to simultaneously strengthen its ongoing collaboration with OSHA, was reasonable.

### C. The Final Rule Is Internally Consistent.

As USDA has explained, the Final Rule's safety-related attestation requirement reflects FSIS's longstanding position that while it may not regulate worker safety, it may support OSHA's efforts in that area provided it makes clear that OSHA, not FSIS, is charged with regulating worker safety. *See* Def.'s Br. at 24–25. In response, Plaintiffs argue that the attestation requirement is a direct regulation of worker safety, rather than a collaboration with OSHA. *See* Pls.' Br. at 17–18. Plaintiffs ignore that FSIS employees are "not . . . responsible for determining the merit of the content of the attestation or for enforcement of non-

9

compliance with the attestation provision," and merely "forward [the] annual attestations to OSHA for use in its own enforcement program."  84 Fed. Reg. at 52,315, AR 100208. Plaintiffs also ignore USDA's well-reasoned, *pre*-hoc explanation of why FSIS may not unilaterally "impose operating requirements focused solely on establishment worker safety," but may adopt limited, collaborative measures to support OSHA.  *See* AR 103199–103200, 103204–103206.

Accordingly, if the Court reaches the merits of Plaintiffs' APA claim, it should grant USDA's cross-motion for summary judgment.

### III. If the Court Grants Plaintiffs' Motion, Vacatur of the Entire Final Rule Would Be Inappropriate.

If the Court reaches the merits and rules for Plaintiffs, remand without vacatur would be the proper remedy.  On the first *Allied-Signal* factor, there is a wealth of caselaw holding that remand without vacatur is appropriate where an agency erred in its initial rulemaking process, but could likely adopt the same policy in the future by taking new agency action.  *See, e.g.*, *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015) (explaining that remand without vacatur is appropriate where "by complying with procedural rules, [the agency] could adopt the same rule on remand," but not where "fundamental flaws in the agency's decision make it unlikely that the same rule would be adopted on remand"); *La. Fed. Land Bank Ass'n, FLCA v. Farm Credit Admin.*, 336 F.3d 1075, 1085 (D.C. Cir. 2003) (explaining that remand without vacatur is appropriate where "it is not unlikely the [agency] 'will be able to justify a future decision'" to readopt the rule).

Plaintiffs do not dispute that USDA has authority to revoke maximum evisceration-line speeds for NSIS establishments by taking new agency action in the future, or that the

10

above-referenced cases prescribe remand without vacatur for that reason. *Compare* Def.'s Br. at 26–27, *with* Pls.' Opp. at 20–22. Instead, Plaintiffs contend that these cases were abrogated *sub silentio* by the Supreme Court's recent decision in *Regents*. *See* Pls.' Opp. at 20 & n.6 (conceding that there is no pre-*Regents* support for Plaintiffs' position).

In *Regents*, the Supreme Court reviewed a district court decision that DHS had insufficiently justified its rescission of the Deferred Action for Childhood Arrivals ("DACA") program. *See* 140 S. Ct. at 1904 (citing *NAACP v. Trump*, 298 F. Supp. 3d 209, 243 (D.D.C. 2018)). The district court determined that the first *Allied-Signal* factor counseled in favor of remand without vacatur because "it is certainly possible that [DHS] could articulate a valid reason for DACA's rescission" in the future. *NAACP*, 298 F. Supp. 3d at 244. Concerned that remand without vacatur might invite a lengthy delay with "troubling humanitarian consequences," however, the court decided to "vacate DACA's rescission but stay its order of vacatur for 90 days." *Id.* at 245.

The Supreme Court explained that the district court's remand "presented DHS with a choice: rest on [its original rescission of DACA] while elaborating on its prior reasoning, or issue a new rescission bolstered by new reasons." *Regents*, 140 S. Ct. at 1908. Because DHS "took the first path," it could only offer a fuller explanation of its reasoning at the time of the original rescission. *Id.* The Court made clear, however, that DHS could have "issue[d] a new rescission bolstered by new reasons" during the 90-day remand without vacatur. *Id.* Thus, *Regents* simply reaffirms the longstanding principle that if an agency wishes to offer new reasons on remand (with or without vacatur) it must reaffirm its decision through "new agency action." *Id.* *Regents* in no way casts doubt on the well-established practice of granting remand

11

without vacatur in circumstances where new agency action is likely necessary.

A recent Ninth Circuit decision confirms as much. Citing *Regents*, the Ninth Circuit held that the Environmental Protection Agency violated the APA by failing to consider a relevant factor in registering a certain pesticide. *Nat'l Family Farm Coal. v. EPA*, 966 F.3d 893, 917, 929 (9th Cir. 2020). The Court remanded the case without vacatur, explaining that the agency could likely "adopt the same rule on remand." *Id.* at 929 (quoting *Pollinator*, 806 F.3d at 532). Thus, *Regents* did not alter the first prong of the *Allied-Signal* inquiry. *Contra* Pls.' Opp. at 20 (incorrectly asserting that *Regents* "held . . . [that] an agency cannot use remand without vacatur to offer new reasons for an action when its prior reasoning was arbitrary and capricious").[1]

On the second *Allied-Signal* factor, USDA has explained that interim vacatur of the line-speed provision "would cause significant disruptions for slaughter establishments, their employees, FSIS, and its employees." Def.'s Br. at 30. *Amici* confirm the severity of these disruptions; for example, vacatur would cost the Guymon establishment an estimated $82 million and require its employees to work an additional 23 Saturdays per year. Proposed Amicus Br. of North American Meat Institute and National Pork Producers Council, ECF No. 103 at 11; *see also id.* at 6–7, 8–9, 12–14. Plaintiffs have no basis for suggesting that these consequences are not "serious," Pls.' Opp. at 23. And Plaintiffs' allegations that the Final Rule will increase work pace and diminish worker spacing, thereby threatening worker safety, are highly speculative. *See supra* pp. 3–6. The numerous disruptions identified by USDA and *amici*

---

[1] Plaintiffs' passing suggestion that the Court should "decline[] to remand" the matter at all, Pls.' Opp. at 22, is inconsistent with basic principles of administrative law. *See* Def.'s Br. at 33.

clearly outweigh the speculative decrease in risk alleged by Plaintiffs.

Finally, Plaintiffs have no persuasive response to USDA's alternative argument that vacatur should be limited to the line-speed provision. *Compare* Def.'s Br. at 31–33, *with* Pls.' Opp. at 24. Plaintiffs are not injured by any other provision of the Final Rule, *see* April 1 Order at 14, and it is well established that a judicial remedy "must be tailored to redress the plaintiff's particular injury," *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018); *see also Am. Fed'n of Labor & Cong. of Indus. Orgs. v. NLRB*, No. 20-cv-0675, 2020 WL 3041384, at *20 (D.D.C. June 7, 2020) (persuasively applying this principle to APA litigation). Moreover, Plaintiffs fail to rebut FSIS's explanation that it "would still have adopted the Final Rule without the line-speed provision in order to achieve potential public-health benefits" and "to reduce the agency's labor expenses by approximately $6.67 million annually." Def.'s Br. at 33.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment should be denied, and USDA's cross-motion should be granted. If the Court grants Plaintiffs' motion, however, it should remand the Final Rule without vacatur. Alternatively, vacatur should be limited to the line-speed provision.

Dated: September 17, 2020

                      Respectfully submitted,

                      JEFFREY BOSSERT CLARK
                      Acting Assistant Attorney General

                      ERIC R. WOMACK
                      Assistant Director, Federal Programs Branch

                      */s/ Joseph J. DeMott*
                      JOSEPH J. DEMOTT

Trial Attorney (Va. Bar No. 93981)
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel: (202) 514-3367
Fax: (202) 616-8470
Email: Joseph.DeMott@usdoj.gov

*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on September 17, 2020, I electronically filed the foregoing paper with the Clerk of Court using this Court's CM/ECF system, which will notify all counsel of record of such filing.

/s/ *Joseph J. DeMott*
JOSEPH J. DEMOTT
Trial Attorney (Va. Bar No. 93981)
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel: (202) 514-3367
Fax: (202) 616-8470
Email: Joseph.DeMott@usdoj.gov
