UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United Food and Commercial Workers
Union, Local No. 663; United Food and
Commercial Workers Union, Local No.
440; United Food and Commercial
Workers Union, Local No. 2; and United
Food and Commercial Workers Union,
AFL-CIO, CLC,

        Plaintiffs,

v.

      Case No. 19-cv-2660 (JNE/TNL)
      ORDER

United States Department of Agriculture,

        Defendant.

      Under the Federal Meat Inspection Act ("FMIA"), federal inspectors with the

Department of Agriculture's Food Safety and Inspection Service ("FSIS") monitor pork

slaughterhouses to ensure that safe and wholesome pork products are sold to the public.

These inspectors examine all swine that will become meat products before and after

slaughter. *See* 21 U.S.C. § 604. To ensure adequate post-mortem inspections, FSIS

regulates the speed of evisceration lines. *See* 9 C.F.R. § 310.1(b)(3). In October 2019,

FSIS adopted the New Swine Inspection System ("NSIS"), an optional program that

implemented several reforms, including the elimination of evisceration line speed limits.

*See* Modernization of Swine Slaughter Inspection, 84 Fed. Reg. 52,300, 52,315 (Oct. 1,

2019) ("Final Rule").

      On behalf of workers at pork processing plants, the United Food and Commercial

Workers Union ("UFCW") and three of its local chapters challenged the Final Rule under

1

the Administrative Procedure Act ("APA"). The case is now before the Court on the parties' cross-motions for summary judgment and USDA's motion for remand without vacatur. For the reasons discussed below, Plaintiffs have standing to bring this case and have shown that the agency violated the APA. When FSIS proposed the NSIS, it expressly identified worker safety as an important consideration and requested public comment on whether increasing line speeds would harm workers. Then, after receiving many comments raising worker safety concerns, FSIS rejected the comments and eliminated line speed limits without considering worker safety.  In doing so, the agency failed to satisfy the APA's requirement of reasoned decision-making. Therefore, the Court will vacate the Final Rule's elimination of line speed limits under the NSIS, codified at 9 C.F.R. § 310.26(c), but will not set aside any other aspect of the Final Rule. To give the agency and regulated entities an opportunity to adapt to the vacatur, the Court will stay this order and entry of judgment for 90 days.

## BACKGROUND

**I.   Regulatory and Industry Background**

**A.  The Traditional Swine Inspection System**

"Meat and poultry plants are generally designed for an orderly flow from point of entry of the living animal to the finished food product." GAO, GAO-18-12, Workplace Safety and Health: Better Outreach, Collaboration, and Information Needed to Help Protect Workers at Meat and Poultry Plants 5–6, fig. 2 (2017), https://www.gao.gov/assets/gao-18-12.pdf ("2017 GAO Report"), Admin. R. ("AR") 101383. The process begins on the kill floor, "where the animal is rendered unconscious and slaughter occurs."

*Id.* at 5. Then, the animals are hung on shackles attached to a mechanized line, the evisceration line, that carries the carcasses through evisceration and inspection. *Id.* at 6, fig. 2. After evisceration, carcasses are chilled and then, on the processing line, cut "into small portions that can be transported directly to supermarkets." *Id.* at 5.

Under the FMIA, FSIS conducts ante- and post-mortem inspections of all hogs that will be sold as pork products. *See* 21 U.S.C. §§ 603–04; 9 C.F.R. § 310.1(a). FSIS inspectors assess the hogs after slaughter while they are both on and off the evisceration line. 2017 GAO Report at 5. During evisceration, plant employees trim the animals and federal inspectors conduct an inspection. Modernization of Swine Slaughter Inspection, 83 Fed. Reg. 4780, 4783–84 (proposed Feb. 1, 2018) ("Proposed Rule"). If the animals are found fit for consumption, inspectors then conduct an offline examination that includes testing for foodborne pathogens, like salmonella. *Id.* at 4785.

Under the traditional inspection system, most slaughterhouses voluntarily segregate obviously unfit animals, so FSIS only needs to inspect the animals the facility has deemed appropriate for slaughter. *Id.* at 4783. After slaughter, however, most establishments do not inspect the carcasses again to identify and remove correctable defects or flag carcasses that should be condemned. *Id.* at 4784. This means that FSIS inspectors conduct this time-intensive sorting, which slows down inspection rates and leaves less time to inspect apparently healthy carcasses for foodborne pathogens. *Id.*

In 1996, FSIS adopted a new framework of inspection that required slaughterhouses to develop more preventive controls to ensure they produced safe meat products: the hazard analysis and critical control point system ("HACCP"). *Id.* at 4780.

3

FSIS then launched a pilot program, the HACCP-Based Inspection Models Project ("HIMP"). *Id.* One goal of HIMP was to give federal inspectors more time to prioritize testing for foodborne pathogens by making pork processing establishment employees, instead of FSIS staff, responsible for sorting activities. *Id.* at 4784.

The first HIMP model FSIS proposed did not involve an examination of each animal carcass by FSIS inspectors, which the D.C. Circuit found violated the FMIA. *See Am. Fed'n Gov't Emps., AFL-CIO v. Glickman*, 215 F.3d 7, 11 (D.C. Cir. 2000). FSIS consequently modified HIMP to include an inspection of each carcass by federal agents, which the court found complied with the FMIA. *Am. Fed'n Gov't Emps., AFL-CIO v. Veneman*, 284 F.3d 125, 130 (D.C. Cir. 2002).

In 2013, the USDA Office of Inspector General ("OIG") audited HIMP and concluded that FSIS had not adequately overseen the program, potentially increasing food safety risks. Proposed Rule at 4788 (citing OIG, USDA, Audit Rep. 24601-0001-41, Food Safety and Inspection Service – Inspection and Enforcement Activities at Swine Slaughter Plants (2013), https://www.usda.gov/sites/default/files/24601-0001-41.pdf ("2013 OIG Report")). It also found that three of the five HIMP plants had some of the highest noncompliance records in the industry "because of FSIS' lack of oversight." 2013 OIG Report at 17. The Government Accountability Office ("GAO") similarly reviewed HIMP, finding that FSIS had not adequately evaluated it and that it led to faster line speeds, creating food and worker safety concerns. GAO, GAO-13-775, Food Safety: More Disclosure and Data Needed to Clarify Impact of Changes to Poultry and Hog Inspections (2013), https://www.gao.gov/assets/gao-13-775.pdf ("2013 GAO Report"),

AR 101277; 2017 GAO Report at 1. In response to these reports, FSIS evaluated the

HIMP program and reached the opposite conclusion. *See* Proposed Rule at 4790. It found

that HIMP establishments had more food safety inspections and demonstrated improved

compliance with sanitation standards. *Id.*

### B. The New Swine Inspection System

In February 2018, USDA published a notice of proposed rulemaking ("NPRM")

that proposed establishing the NSIS. *Id.* at 4780. NSIS would replicate features tested in

the HIMP pilot, including: requiring slaughterhouses to conduct ante- and post-mortem

sorting to remove defective or contaminated animals; reducing the number of FSIS online

inspectors, which would allow FSIS to increase offline inspections; and increasing

maximum line speeds. *Id.* at 4780–81. In the NPRM, FSIS relied upon a preliminary

analysis of OSHA data to state that HIMP facilities had lower worker injury rates. *Id.* at

4796. FSIS specifically requested comment on the effects increased line speeds may have

on worker safety:

> FSIS recognizes that evaluation of the effects of line speed on food safety should
> include the effects of line speed on establishment employee safety. . . . FSIS is
> requesting comments on the effects of faster line speeds on worker safety.
> Specifically, FSIS is requesting comments on whether line speeds for the NSIS
> should be set at the current regulatory limit of 1,106 hph or some other number.

*Id.*

Many interested parties answered the agency's call for comments about line

speeds. Citing Bureau of Labor Statistics data and studies by OSHA and GAO, these

commenters noted that eliminating line speed limits would harm workers, increase injury

rates, and reduce the quality of meat products. *See, e.g.*, Professor Melissa J. Perry, ScD,

5

MHS, FACE, Comment on Proposed Rule (May 2, 2018), https://www.regulations.gov/
comment/FSIS-2016-0017-83467 ("Perry Comment"), AR 96947; Am. Public Health
Ass'n Occupational Health & Safety Section, Comment on Proposed Rule (Apr. 26,
2018), https://www.regulations.gov/comment/FSIS-2016-0017-61127 ("APHA
Comment"), AR 62444. For example, one comment cited an OSHA recommendation that
"establishments should reduce line speeds and production rates to decrease injury rates."
Final Rule at 52,314.

On October 1, 2019, FSIS adopted the regulations proposed in the NPRM. *Id.* at
52,300. FSIS responded to the worker safety comments by asserting that it had "neither
the authority nor the expertise to regulate issues related to establishment worker safety"
under the FMIA. *Id.* at 52,315. Instead, FSIS wrote, OSHA has the statutory authority to
regulate worker safety in slaughterhouses. *Id.* While it agreed that worker safety is
important, it stated that it was compelled by law to only regulate food safety, not
establishment worker safety. *Id.* The Final Rule also required each NSIS establishment to
submit an annual attestation to the local FSIS safety committee "stating that it maintains a
program to monitor and document any work-related conditions of establishment
workers." 9 C.F.R. § 310.27; Final Rule at 52,315. FSIS wrote that it would forward
these attestations to OSHA and work with OSHA to improve worker safety, following the
terms of an agreement between the agencies. *See* Final Rule at 52,315 (citing
Memorandum of Understanding Between OSHA and FSIS (Feb. 4, 1994)).

### C.  Related Administrative Actions

Before FSIS enacted the NSIS, FSIS had considered its role in promoting safety for the employees of meat processing facilities. In 2013, the agency requested an opinion from the USDA's Office of General Counsel regarding the extent of its legal authority to regulate worker safety. In 2015, the agency modified the poultry slaughter inspection system and considered lines speeds in relation to worker safety. In 2017, GAO reviewed the agency's role in promoting safety for meat processing workers.

#### 1.  2013 Office of General Counsel Memorandum

USDA's Office of General Counsel drafted a memorandum in response to a Department of Labor request that FSIS "implement an illness and injury surveillance system to monitor and document any work related medical conditions that arise among establishment employees during the implementation of" a new poultry inspection system. Memorandum for the Gen. Couns., USDA, from James A. Booth, Assistant Gen. Couns. & Sheila H. Novak, Deputy Assistant Gen. Couns. 2 (Mar. 15, 2013) ("OGC Memo"), AR 103198. After this memorandum was drafted, FSIS found that it lacked the authority to create such a system. *See* FSIS White Paper on the Insufficient Nexus Between Illnesses in Workers and Food Safety 1 (May 29, 2013), AR 103209. After analyzing FSIS's authorizing statutes and the legislative history, the memo determined that because FSIS's primary purpose was related to food safety, it could not establish a new regulatory requirement related only to worker safety. OGC Memo at 4–5. It cited a district court opinion that reached the same conclusion: "the purpose and intent of the FSIS is to ensure

food safety, not workplace safety." *Id.* at 4 (quoting *Dawkins v. United States*, 226 F. Supp. 2d 750, 757 (M.D.N.C. 2002).

After rejecting the notion that FSIS could regulate worker safety, the memo explained that "it may *consider* factors beyond those in the [Poultry Products Inspection Acts]," including worker safety. OGC Memo at 6. The memo noted that "statutes such as the Regulatory Flexibility Act, the National Environmental Policy Act and various Executive Orders (EO) require agencies to consider factors beyond those in their authorizing legislation when they promulgate regulations." *Id.* The memo concluded: "While an agency may enact rules with provisions that are not explicitly authorized in the enabling legislation, the imposition of requirements that are not related to food safety and are based on findings not made by FSIS would be outside the agency's authority." *Id.* at 11.

One example of how FSIS has considered worker safety is in its collaboration with OSHA. In 1994, the two agencies adopted a Memorandum of Understanding ("MOU") that established training protocols that would allow FSIS inspectors to better recognize and report unsafe working conditions to OSHA. Memorandum of Understanding Between OSHA and FSIS (Feb. 4, 1994), https://www.osha.gov/laws-regs/mou/1994-02-04, AR 103211. The MOU acknowledges that FSIS's primary responsibility is food safety and that OSHA is primarily responsible for workplace safety. *Id.*

The OGC Memo also cites some precedents to establish that FSIS had historically taken a similar approach to worker safety. For example, in a proposed rule to implement a new poultry inspection system, FSIS noted that its "direct legal authority with respect to

regulating working conditions extends only to [FSIS] inspection personnel," and that "OSHA is the lead Federal agency responsible for establishment worker safety issues." Modernization of Poultry Slaughter Inspection, 77 Fed. Reg. 24,873, 24,877 (proposed Apr. 26, 2012). In both a 1999 rule and a 1992 rule permitting poultry producers to use irradiation to treat pathogens in poultry products, FSIS required the producers to document compliance with Nuclear Regulatory Commission and OSHA requirements for worker safety. Irradiation of Meat Food Products, 64 Fed. Reg. 72,150, 72,151 (Dec. 23, 1999); Irradiation of Poultry Products, 57 Fed. Reg. 43,588, 43,594 (Sept. 21, 1992). In both actions, the agency collaborated with OSHA to address worker safety concerns related to food safety requirements.

In short, the 2013 OGC Memo found that although FSIS could not implement a new regulatory requirement focused solely on workplace safety, it could consider worker safety in its rulemaking and collaborate with the appropriate federal agencies to advance safety-related measures.

### 2. 2015 Poultry Rulemaking

In a 2015 rulemaking that established a New Poultry Inspection System ("NPIS"), FSIS considered concerns raised about worker safety. Modernization of Poultry Slaughter Inspection, 79 Fed. Reg. 49,566, 49,599 (Aug. 21, 2014). In that rulemaking, FSIS retained the pre-existing line speed limits. *Id.* at 49,567. Many commenters to that rule raised concerns that faster line speeds would negatively affect workers' health and safety. *Id.* at 49,597–98. FSIS established a collaboration with the CDC's National Institute for Occupational Safety and Health ("NIOSH") to evaluate the role of line speeds in worker

health and safety. *Id.* at 49,596. FSIS wrote that it considered this study "to be an important first step in measuring any impact of evisceration (or inspection) line speeds on workers in poultry slaughter and processing establishments." *Id.*

Additionally, in the poultry final rule, FSIS discussed its collaboration with OSHA: "FSIS also recognizes the importance of establishment worker safety and will work with OSHA to heighten FSIS employees' awareness of serious occupational safety hazards in FSIS-regulated establishments." *Id.* In fact, "FSIS had numerous discussions with OSHA during the development of this final rule on how best to address potential issues related to line speeds and worker safety." *Id.* at 49,597. FSIS noted that while it was working with OSHA to address this issue, "any increase in line speed that establishments implement under the NPIS will not exceed the maximum line speeds authorized under the existing inspection systems." *Id.* FSIS then described and endorsed OSHA's recommendations, while noting that it did "not have the authority to require that establishments adopt these recommendations." *Id.* "To stress the importance of establishment worker safety, FSIS has modified the proposed regulation that prescribes maximum line speed rates under the NPIS to emphasize establishments' existing legal obligation to comply with OSHA statutes." *Id.*

In the poultry rule, FSIS directly addressed comments about line speeds and worker safety by reviewing the research cited by commenters. *Id.* at 49,598. In doing so, it noted that "a key distinction should be made between processing line speed, inspection line speed, and daily production volume." *Id.* FSIS only directly regulates poultry inspection lines and the work pace at a plant depends on multiple factors. *Id.* For

10

example, staffing, technology, operating hours, and production volume also affect work pace. *Id.* Notwithstanding that observation, FSIS created a safety-related attestation requirement for poultry plants to address "concerns about the effects that increased line speeds might have on the health and safety of workers." *Id.* at 49,600. The attestation requires poultry plants to state that they maintain "a program to monitor and document any work-related conditions that arise among establishment workers." *Id.* "As OSHA is the Federal agency with statutory and regulatory authority to promote workplace safety and health, FSIS will forward the annual attestations to OSHA for further review." *Id.*

Finally, FSIS suggested that its adoption of the attestation requirement was within its regulatory authority as established by statute and Executive Order 12866. It noted that FSIS "will not be responsible for determining the merit of the content of each establishment's monitoring program or enforcement of noncompliance with this section." *Id.* It also stated that the requirement of coordinating with OSHA was "[c]onsistent with the mandate of E.O. 12866." *Id.* Executive Order 12866 promotes interagency coordination and the reduction of "unacceptable or unreasonable costs on society." Exec. Order No. 12866, 58 Fed. Reg. 51,735 (Sept. 30, 1993). FSIS justified the attestation by noting that identifying worker risks would "reduce the costs associated with worker injury by enabling establishments to adjust their processes or implement other appropriate measures before additional employees are affected." Modernization of Poultry Slaughter Inspection, 79 Fed. Reg. at 49,600.

### 3. 2017 Government Accountability Office Report

In 2017, the Government Accountability Office ("GAO") reviewed OSHA and FSIS efforts to improve workplace safety at meat and poultry plants. It found that the MOU between OSHA and FSIS had not been fully implemented and that FSIS officials did not report workplace hazards to OSHA for fear of triggering an inspection. 2017 GAO Report at 34. FSIS had not contacted OSHA "as it developed a proposed rule that would, among other things, have permitted plants to operate at a faster maximum speed." *Id.* at 37. FSIS officials stated that coordinating with OSHA was unnecessary because they believed that the Office of Management and Budget interagency review process was sufficient to address any worker safety concerns. *Id.* at 38.

GAO concluded that "the federal government is missing out on a cost-effective opportunity to further protect the safety and health of both plant workers and FSIS inspectors." *Id.* at 49. In response to this report, FSIS noted that "in collaborating with OSHA, FSIS will need to ensure its primary mission is not compromised by undertaking activities that take time and resources away from its food safety inspection responsibilities." *Id.* at 52.

## II.   NSIS Implementation

Since the Final Rule took effect, several pork processing plants have converted to the NSIS. Workers at several facilities that FSIS anticipated would implement the NSIS submitted affidavits explaining how line speeds affect their health and safety.

12

## A. Plants Adopting the NSIS

According to the USDA, as of July 28, 2020, seven pork processing plants had converted to the NSIS. Decl. of Hany Sidrak ("Sidrak Decl.") ¶ 5.  Of these plants, only Seaboard Foods in Guymon, Oklahoma had experienced a change, because the other plants had previously operated under HIMP or received line speed waivers. *Id.* ¶ 6.[1] Two other plants had written to USDA stating that they intended to convert to the NSIS in 2020. *See* Decl. of Adam Pulver ("Pulver Decl.") Exs. 1–2, ECF No. 108.

Three of these plants submitted affidavits through amici, the North American Meat Institute and the National Pork Producers Council. *See* Amicus Brief of the N. Am. Meat Inst. & Nat'l Pork Producers Council ("Pork Industry Amicus Brief") Exs. 1–3. An operational vice president from Clemens Food Group testified that its plants operated at an average speed of 1250 heads per hour ("hph") between May and July of 2020. *Id.* Ex. 1, Decl. of Eric Patton ("Patton Decl.") ¶ 5. Clemens spent about $63 million to upgrade its facilities for the NSIS and anticipates a $42 million annual increase in profits as a result. *Id.* ¶ 15. WholeStone Farms Cooperative operated at an average line speed of 1295 hph in 2020. *Id.* Ex. 2, Decl. of WholeStone Farms Coop. ("Weers Decl.") ¶ 5. Seaboard Foods averaged a line speed of 1118 hph in the second quarter of 2020 and invested $82 million in upgrades to convert to NSIS. *Id.* Ex. 3, Decl. of Stephen Summerlin ("Summerlin Decl.") ¶¶ 3, 14.

---

[1]     The Final Rule ended the pre-existing waivers. Final Rule at 52,301. FSIS is authorized to grant waivers for limited time periods for experimentation. 9 C.F.R. § 303.1(h).

## B. Workers Affected by the NSIS

Plaintiffs in this case are three local chapters of the UFCW and the international UFCW.[2] According to its constitution, the international UFCW is authorized to represent the members of these local chapters. Decl. of Richard Dennis Olson ("Olson Decl.") Ex. A., 2018 UFCW International Constitution, art. 1(A). Plaintiffs' members work in all aspects of pork production, including on the evisceration line, kill floor, and production line. Decl. of Martin Rosas ¶ 6. They submitted affidavits explaining how evisceration line speeds affect their work.

Plaintiffs' members testified that they face significant risks when the evisceration line operates at higher speeds. For example, Chiedzo Henry works on the evisceration line at the JBS plant in Ottumwa, Iowa and uses sharp scissors to remove the pancreases of hogs. Decl. of Chiedzo Henry ("Henry Decl.") ¶ 4. Demarcus Sykes guts hogs at the Tyson plant in Waterloo, Iowa and uses "sharp knives to remove viscera while hog carcasses pass by on a moving, mechanized line." Decl. of Demarcus Sykes ("Sykes Decl.") ¶ 4. At the Tyson plant in Logansport, Indiana, Robert Haskew similarly uses knives to trim viscera. Decl. of Robert Haskew ("Haskew Decl.") ¶¶ 1–4. Union members on the evisceration line state that they are more likely to be injured by

---

[2]      The local labor unions represent workers at four swine processing plants in Minnesota, Iowa, Missouri, and Oklahoma. Decl. of Matthew Utecht ¶ 4 (Local 663, Minnesota); Decl. of Leo Kanne ¶ 4 (Local 440, Iowa); Decl. of Martin Rosas ¶¶ 4–5 (Local 2, Missouri and Oklahoma). Each of these plants is one that FSIS identified as likely to increase its line speeds and adopt the NSIS. Decl. of Richard Dennis Olson ("Olson Decl.") ¶ 5. The international UFCW represents 33,000 workers in the pork processing industry and its members work at 18 of the 40 high-volume establishments FSIS expected to implement the NSIS. Olson Decl. ¶ 5; Final Rule at 52,322.

14

lacerations when working at faster speeds to keep pace with the line. *See, e.g.*, Henry Decl. ¶ 5.

Before hogs reach the evisceration line, they pass through the kill floor where workers gambrel the hogs by cutting and hanging the carcasses. Decl. of Mark Lauritsen ("Lauritsen Decl.") ¶ 17. This requires workers to maneuver and lift hog carcasses that weigh approximately 400 pounds. Decl. of Sean Fuller ("Fuller Decl.") ¶ 5. When the evisceration line moves faster, the kill floor workers must keep pace with the line. *Id.* ¶ 7. These workers state that hog carcasses will sometimes fall from the hooks, injuring workers, and that this risk increases as they work at higher speeds. *Id.*; Decl. of Jose Quinonez ("Quinonez Decl.") ¶ 13; Decl. of David Eric Carrasco ("Carrasco Decl.") ¶ 10. David Eric Carrasco at the Smithfield plant in Denison, Iowa testified that he has hooked himself by accident because of high speeds. Carrasco Decl. ¶ 9. He has also had hogs fall on him and has seen workers injured by falling hogs. *Id.* ¶¶ 10–12.

Marty Stein, who also works at the Smithfield plant in Denison, testified: "everything I do is affected by the line speed." Decl. of Marty Joseph Stein ("Stein Decl.") ¶¶ 1, 6. He processes internal organs directly from the kill floor to produce pet food and must keep pace with the line. *Id.* ¶¶ 5–6. Amanda Miranda works on the kill floor at a Triumph Foods facility in St. Joseph, Missouri. Decl. of Amanda Miranda ("Miranda Decl.") ¶ 1. She testified that when the line moves faster, workers get behind on making the required incisions while the hog is directly in front of them. *Id.* ¶ 16. That means that they must scoot over to reach hogs that have already passed their area, making it more likely they will collide with and possibly cut other workers. *Id.*

15

Jose Quinonez is a union member who works at the Seaboard Foods plant in Guymon, Oklahoma. Quinonez Decl. ¶ 1. He is a "walking steward" on the production floor. *Id.* ¶ 5. He also works as a tongue x-ray operator and removes skin and hair using a six-inch knife at a table with other workers. *Id.* ¶¶ 9–10. He states that the line speeds were running at about 1200 hph in 2020 prior to the COVID-19 outbreak. *Id.* ¶ 8. He testified that the plant did not change hours or hire more workers, but instead required them to work faster. *Id.* ¶ 14. When working faster, he feels more pain in his hands and shoulders from repetitive motions. *Id.* ¶¶ 11–12. Additionally, he testified to witnessing hogs fall off the chain and injure workers on the kill floor. *Id.* ¶ 13.

Other UFCW members have worked on the cut floor where they trimmed chilled meat. For example, Elizabeth Bell, who now boxes meat products at the Smithfield plant in Tar Heel, North Carolina, used to skin and cut pork loins using a circular blade. Decl. of Elizabeth Bell ("Bell Decl.") ¶¶ 1, 8. She testified that she has "seen USDA inspectors stop the line when a worker is injured in the past, or in order to stop a worker from being injured." *Id.* ¶ 12. "They have to stop the line when people get injured because people bleed on the line." *Id.* Pablo Martinez currently cuts pork loins at the JBS facility in Worthington, Minnesota. Decl. of Pablo Martinez ("Martinez Decl.") ¶¶ 1–2. He has testified that he experiences pain when the lines move faster and has "observed severe hand injuries to my coworkers on the kill floor who use knives." *Id.* ¶ 8. He wrote: "I see that workers' hands so mangled I cannot imagine they could even write a check." *Id.*

Hany Sidrak, a Deputy Assistant Administrator in FSIS's Office of Field Operations has testified that the elimination of evisceration line speed limits will only

16

affect the work pace of the evisceration line, not the processing line. Sidrak Decl. ¶ 1. After evisceration, the hogs are chilled for approximately 24 hours before further processing can occur. *Id.* ¶ 13. "Because of this chilling step, the speed of evisceration lines can have no impact on the speed of processing lines." *Id.* This official also testified that most employees do not use sharp objects on the evisceration line: "The only establishment employees who use knives on the evisceration line are those responsible for removing abnormalities and contamination from carcasses and those who incise mandibular lymph nodes." *Id.* ¶ 12.

Pork producers cited data from three plants to demonstrate that there is no correlation between increased line speeds and injuries. *See* Pork Industry Amicus Brief at 5, 10, 15. At Clemens, for example, the OSHA reportable incident rate for repetitive motion injuries has decreased from a rate of 18.1 per 100 employees in 2014 to 3.1 in May and June of 2020. Patton Decl. ¶¶ 6–13. The incident rate for lacerations has been more variable, from 2.9 in 2014, to a low of 1.3 in 2019, to a new high of 3.8 in 2020. *Id.*

## III.   Procedural History

Plaintiffs filed this lawsuit under the APA challenging the reduction in FSIS inspectors and the elimination of line speed limits. *See* 5 U.S.C. § 706. Plaintiffs argue that USDA's elimination of line speed limits was arbitrary and capricious because the agency failed to consider worker safety. USDA moved to dismiss the lawsuit and in April 2020, the Court dismissed Plaintiffs' challenge to the inspector reduction for lack of standing but allowed the line speed challenge to proceed.

After the Court ruled on Defendant's motion to dismiss, Defendant filed a motion to stay summary judgment proceedings and remand the case back to the agency without vacating the Final Rule. While that motion was pending, Plaintiffs moved for summary judgment. The Court denied Defendant's request to stay summary judgment proceedings and deferred ruling on the remand request until it ruled on summary judgment. Defendant then filed a cross-motion for summary judgment. Now, the parties' cross-motions for summary judgment and Defendant's remand request are before the Court.

## DISCUSSION

### I.   Article III Standing

USDA argues that Plaintiffs cannot prove that they have standing under Article III of the Constitution. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559–60 (1992); *Iowa League of Cities v. EPA*, 711 F.3d 844, 869 (8th Cir. 2013). Because standing is a jurisdictional requirement, "the court has an independent obligation to assure that standing exists, regardless of whether it is challenged by any of the parties." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009). On USDA's motion to dismiss, the Court concluded that Plaintiffs had pleaded Article III standing for their challenge to the elimination of line speed limits in the Final Rule. Now, "to survive a summary judgment motion, '[they] must set forth by affidavit or other evidence specific facts'" to prove each element of standing "by a preponderance of the evidence." *Iowa League of Cities*, 711 F.3d at 869 (quoting *City of Clarkson Valley v. Mineta*, 495 F.3d 567, 569 (8th Cir. 2007)); *Miller v. Thurston*, 967 F.3d 727, 734–35 (8th Cir. 2020).

18

"Standing is determined as of the commencement of the lawsuit." *Disability Support All. v. Heartwood Enters., LLC*, 885 F.3d 543, 545 (8th Cir. 2018). To establish standing, Plaintiffs "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). "An injury in fact is the 'invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Disability Support All.*, 885 F.3d at 545 (quoting *Defs. of Wildlife*, 504 U.S. at 560). "An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk that the harm will occur.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)).

## A. Associational Standing

An organization may sue on its members' behalf if: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Owner-Operator Indep. Drivers Ass'n, Inc. v. U.S. Dept. of Transp.*, 831 F.3d 961, 967 (8th Cir. 2016) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). The association "need not establish that all of its members would have standing to sue individually so long as it can show that 'any one of them' would have standing." *Iowa League of Cities*, 711 F.3d at 869 (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975)).

Here, Plaintiffs are labor unions suing on behalf of their members who work at pork processing plants. The unions satisfy the second element of the associational standing test because the safety interests of the workers they seek to protect through this lawsuit are "germane to the organization's purpose." *Owner-Operator*, 831 F.3d at 967. The UFCW is organized, in part, "to advance and safeguard the full employment, economic security, and social welfare of its members" and to improve "working conditions." Olson Decl. Ex. A., 2018 UFCW International Constitution, art. 2.

The third element of the associational standing test is a prudential requirement that ensures that the remedy sought by the organization will benefit its members. *See United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 556–57 (1996); *Warth*, 422 U.S. at 515. An organization may seek declaratory or injunctive relief for its members, but typically cannot bring a claim for compensatory damages if it requires proof of individualized harm. *Warth*, 422 U.S. at 515–16. Here, the unions seek vacatur of a final rule, a remedy that does not require individualized proof. *See Ark. Med. Soc'y, Inc. v. Reynolds*, 6 F.3d 519, 528 (8th Cir. 1993).

Because Plaintiffs have satisfied the latter two elements of associational standing, the only remaining issue is the first element: whether Plaintiffs' members would have standing to sue in their own right. *Owner-Operator*, 831 F.3d at 967.

### B.  Individual Standing

Plaintiffs must prove that at least one of their members has suffered a concrete and particularized injury that is fairly traceable to the Final Rule and that the injury will be redressed by vacatur of the rule. *See Spokeo, Inc.*, 136 S. Ct. at 1547; *Iowa League of*

*Cities*, 711 F.3d at 869. It is undisputed, and the Court agrees, that if Plaintiffs prove an injury that is traceable to the Final Rule, that injury will be remedied by a vacatur. *See, e.g.*, *Stewart v. Azar*, 313 F. Supp. 3d 237, 252 (D.D.C. 2018) ("Generally, courts will find 'standing exists where the challenged government action authorized conduct that would otherwise have been illegal.'" (quoting *Renal Physicians Ass'n v. HHS*, 489 F.3d 1267, 1275 (D.C. Cir. 2007)).[3] Therefore, redressability will be analyzed as part of the two disputed standing issues: whether any of Plaintiffs' members will suffer an injury-in-fact and whether that injury is traceable to the Final Rule.

### 1. Injury-in-Fact

Where, as here, the injuries alleged are future harms, those injuries will qualify for Article III standing "if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2565 (2019) (quoting *Susan B. Anthony List*, 573 U.S. at 158). That future injury must be both "concrete and particularized" to Plaintiffs' members and "imminent." *Defs. of Wildlife*, 504 U.S. at 560; *In re Supervalu, Inc.*, 870 F.3d 763, 769 (8th Cir. 2017). As the D.C. Circuit has explained, "the proper way to analyze an increased-risk-of-harm claim is to consider the ultimate alleged harm—such as death, physical injury, or property damage—as the concrete and particularized injury and then to determine whether the increased risk of such harm makes injury to an individual citizen sufficiently imminent

---

[3]      USDA argues that the injury alleged is not directly attributable to the agency action because it depends on the voluntary actions of regulated entities. Although this argument also relates to redressability, the Court will consider it in the context of traceability because that is the context in which USDA raised the issue.

for standing purposes." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 915 (D.C. Cir. 2015) (cleaned up) (citing *Public Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1298 (D.C. Cir. 2007)).[4]

### i.  Individuals Affected

To establish an injury-in-fact, Plaintiffs must prove that at least one of their members will be harmed by the Final Rule. USDA has raised two arguments that attempt to limit the pool of individuals who could be harmed by the Final Rule: (1) that only individuals working at plants that have actually implemented faster line speeds can be considered in this analysis and (2) that only workers on the evisceration line should be considered.

First, USDA's argument that the Court must limit its analysis to workers at plants that have increased line speeds since the lawsuit commenced misconstrues the proper standard for assessing standing. Standing is measured from the time the lawsuit is filed. *See Defs. of Wildlife*, 504 U.S. at 570 n.5; *Disability Support All.*, 885 F.3d at 545. If Plaintiffs cannot "use evidence of what happened after the commencement of the suit" to prove an injury, then USDA cannot use post-suit evidence to limit the Court's analysis of whether an imminent risk of harm existed at the time of filing. *Park v. Forest Serv. of*

---

[4]     USDA, and the D.C. Circuit, have characterized this as a "very strict" standard to prove an imminent risk of harm. *Food & Water Watch*, 808 F.3d at 915. Plaintiffs counter that the Eighth Circuit has not adopted this "strict" standard and instead, that they simply must demonstrate that the risk of harm will be increased to a level that is not speculative or hypothetical. *See Shain v. Veneman*, 376 F.3d 815, 818–19 (8th Cir. 2004). This Court need not weigh in on this issue of characterization because Plaintiffs would satisfy either standard.

*U.S.*, 205 F.3d 1034, 1037 (8th Cir. 2000); *see Conners v. Gusano's Chi. Style Pizzeria*,

779 F.3d 835, 840 (8th Cir. 2015).[5] Because Plaintiffs have claimed a risk of future injury

in this case, the Court must consider if, at the time the case was filed, "the threatened

injury [was] certainly impending, or there [was] a substantial risk that the harm [would]

occur." *Susan B. Anthony List*, 573 U.S. at 158. Plaintiffs bear the burden of proving this

"with the manner and degree of evidence required" at summary judgment. *Defs. of*

*Wildlife*, at 504 U.S., at 561.

Next, USDA seeks to limit standing analysis to workers assigned to the

evisceration line, as that is the only aspect of production with line speeds regulated under

the traditional inspection system. FSIS Deputy Assistant Administrator Sidrak has

testified that "FSIS does not and has never regulated the speed of processing lines, either

under NSIS or under the traditional inspection system." Sidrak Decl. ¶ 12. USDA cites

the final rule modernizing poultry inspections to explain the difference between

processing and evisceration lines:

> FSIS believes a key distinction should be made between processing line speed,
> inspection line speed, and daily production volume. . . . The current poultry
> regulations and this final rule do not prevent industry from running a processing
> line faster or slower than the inspection line. Slaughter establishments have always
> had the ability, at their discretion, to balance operating hours, staffing levels, and

---

[5]     As the Supreme Court has explained, in cases where the facts have changed since
the commencement of the lawsuit, the justiciability issue is one of mootness, not
standing. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S.
167, 179 (2000) (reversing a court of appeals decision that found that the standing test
considers the facts as they exist at each stage of litigation). While an actual, justiciable
controversy must exist at each stage of litigation, standing doctrine considers the facts at
the time the suit is filed whereas mootness doctrine considers the facts during the
pendency of the case. *Id.* at 189–92 (explaining the differences between standing and
mootness). USDA has not raised a mootness argument here.

production line speed in processing departments to match the output of the inspection line. For example, an establishment could choose to operate its processing department at twice the speed of the inspection line, for half of the operating hours. Likewise, it could increase staffing in a processing department and slow the line speed proportionally to handle the volume of birds coming from the inspection line.

Modernization of Poultry Slaughter Inspection, 79 Fed. Reg. at 49,598. Administrator Sidrak testified that this distinction is true for swine establishments as well because "hog carcasses are chilled in a cooler for approximately 24 hours before they are further processed" after evisceration. Sidrak Decl. ¶ 13. Because of this chilling step, the speed of evisceration has "no impact on the speed of processing lines." *Id.*

Plaintiffs argue that the speed of the evisceration line directly affects the speed of other aspects of production. For example, prior to evisceration, hogs must be slaughtered on the kill floor, where the hogs are first hung on the line. Lauritsen Decl. ¶ 12–18. Workers on the kill floor must keep pace with evisceration because "evisceration lines run continuously at one speed from the shackle table, where hogs are gambrelled and hung, through evisceration." *Id.* ¶ 21.

USDA argues that three of the UFCW members identified by Plaintiffs do not work on or near the evisceration line. Elizabeth Bell boxes products. Bell Decl. ¶ 1. David Eric Carrasco works on the shackle table. Carrasco Decl. ¶ 1. Pablo Martinez works on the cut floor. Martinez Decl. ¶ 2. Mr. Carrasco, at least, appears to have a pre-refrigeration role on the kill floor hanging hogs on the line. Lauritsen Decl. ¶ 23 ("Therefore, workers gambrelling hogs at the shackle table, such as declarant David Carrasco, or workers in the evisceration area who receive internal organs, such as Marty

24

Stein, are directly affected by evisceration line speeds."). Even if the Court assumes that USDA is correct that the speed at which Ms. Bell and Mr. Martinez work is entirely unaffected by the Final Rule, named individuals work in positions that are clearly affected. Specifically, Amanda Miranda, Jose Quinonez, David Carrasco, and Sean Fuller work in evisceration or on the kill floor. *See* Miranda Decl. ¶¶ 7–11; Quinonez Decl. ¶ 1; Fuller Decl. ¶ 3. Additionally, Marty Stein works in the evisceration area with internal organs and must keep pace with the evisceration line. Stein Decl. ¶ 6; Lauritsen Decl. ¶ 23.

Here, UFCW members have identified several concrete and particularized harms including lacerations, stress injuries, and being crushed by hogs that fall off the line. Amanda Miranda and Jose Quinonez use knives to trim viscera. Miranda Decl. ¶¶ 9–10; Quinonez Decl. ¶ 9. Ms. Miranda developed carpal tunnel syndrome and had surgery in both hands within her first three years working at a pork plant. Miranda Decl. ¶ 13. Marty Stein recently had shoulder surgery because of "wear and tear from repetitive motions," which he states was "directly related" to his work on the line. Stein Decl. ¶ 10. In addition to the risks of developing stress injuries from these activities, Ms. Miranda and Mr. Stein have testified that they have been cut by other workers attempting to finish cuts on hogs that have already passed through their area. Miranda Decl. ¶ 16 (explaining how workers must complete their cuts before the hog moves out of their area and, if they do not, they might reach into a neighbor's area to finish their cuts); Stein Decl. ¶ 9 ("Once I got stabbed in the hand by my coworker's knife."). GAO has noted faster line speeds may increase the risk of these "neighbor cuts." *See* 2017 GAO Report at 1 (citing GAO,

Additional Data Needed to Address Continued Hazards in the Meat and Poultry Industry 30 (2016), https://www.gao.gov/assets/ 680/676796.pdf.).

UFCW members Sean Fuller and David Carrasco must lift and maneuver hog carcasses onto the line. Fuller Decl. ¶ 5; Carrasco Decl. ¶ 4. Workers in their positions are also at risk of being crushed by hogs that fall off the line. Carrasco Decl. ¶ 10. Mr. Carrasco testified that he must rehang the hogs that fall and testified that he is at greater risk of hooking himself when moving at faster speeds. *Id.* ¶ 9. He pulls hogs from the line to ensure they have been properly trimmed "with a sharp hook in one hand and a knife in the other." *Id.* ¶¶ 4–5. He has "hooked [him]self by accident because of increased line speeds," and has had hogs fall on him. *Id.* ¶¶ 9–10. Other members have testified about similar challenges. *E.g.*, Quinonez Decl. ¶ 13 ("When the lines run faster, the hogs are more likely to fall off and workers are more likely to get injured."); Stein Decl. ¶ 9 ("Because we had to trim quickly to keep pace with product coming off the line, I got cut and nicked often, even while wearing protective gloves."); Haskew Decl. ¶¶ 4–5 ("I use sharp knives to remove abscesses and other contaminants . . . I have to keep pace with the speed of the evisceration line.").

USDA argues that most employees in the evisceration areas do not use sharp objects and seems to imply that, therefore, these employees are not at risk of injury. Sidrak Decl. ¶ 12. Even assuming this is true, Plaintiffs do not need to prove that all of their members work with sharp objects on the evisceration line. The question is whether at least one of Plaintiffs' members works in a position with a risk of a concrete and particularized harm. *See Iowa League of Cities*, 711 F.3d at 869 (citing *Warth,* 422 U.S.

26

at 511). Although Administrator's Sidrak's testimony minimizes the extent to which Plaintiffs' members use sharp objects, it acknowledges that at least some do.

At least several employees, including David Carrasco, Sean Fuller, Amanda Miranda, Marty Stein, and Jose Quinonez, work in areas affected by evisceration line speed and are at risk of concrete and particularized injuries. The testimony submitted by USDA does not meaningfully contradict that evidence. There is no doubt that these workers must perform activities that put them at risk of physical injuries and the speed at which they perform those activities will be increased by faster evisceration line speeds.

### ii. Evidence of Increased Risk of Harm

In addition to establishing concrete harms particularized to their members, Plaintiffs must show that faster evisceration line speeds will increase the risk of harm to a degree that makes those harms "sufficiently imminent for standing purposes." *Food & Water Watch*, 808 F.3d at 915 (cleaned up). USDA argues that they cannot show an increased risk that is substantially above the existing level of risk because working in pork processing plants is already dangerous. Because many factors affect work pace, USDA argues, line speeds alone are not determinative.

Several pieces of evidence in the record suggest that line speed increases will increase the risk the harm to Plaintiffs' members: affidavits from UFCW members, comments made in response to the Proposed Rule, GAO reports, NIOSH research, academic studies, and FSIS's analysis in the Final Rule itself.

First, the union workers explain that when working at faster speeds, they are at a greater risk of injury. Ms. Miranda testified that neighbor cuts are more common when

working at faster speeds. Miranda Decl. ¶ 16. When working at faster speeds, the pain

Mr. Quinonez experiences in his hands and shoulders increases. Quinonez Decl. ¶ 12. Mr.

Carrasco experiences shoulder pain when working at faster speeds and says he has been

more likely to hook himself by accident when moving faster. Carrasco Decl. ¶ 9. Mr.

Fuller states that he is at increased risk of stress injuries from lifting the hogs at faster

speeds. Fuller Decl. ¶ 7. According to Mr. Stein, the faster he works, the more injuries he

has experienced from cuts and stress injuries. Stein Decl. ¶¶ 7–10.

Notably, many of these workers monitor line speeds, have worked at a variety of

speeds, and have noticed differences when the speeds change. For example, Mr.

Quinonez is a walking steward and documents the line speed for his union. Quinonez

Decl. ¶¶ 5–6. He noted that line speeds ran at approximately 1086 hph in 2019 and

increased to 1200 hph in 2020 before the COVID-19 pandemic slowed production. *Id.*

¶¶ 7–8; *see also* Martinez Decl. ¶ 5 (explaining how he monitors line speeds for the

union). Mr. Carrasco explained how the speeds vary throughout the day and can increase

in the afternoon to meet production goals. Carrasco Decl. ¶ 7. He notices more pain when

he works at faster speeds. *Id.* ¶ 8. Because these UFCW members have monitored line

speeds and experienced working at a variety of speeds, they can describe a connection

between line speed and their risk of injury.

Next, comments from the public in the administrative record support the increased

risks described by UFCW members. Professor Melissa J. Perry has conducted NIOSH-

funded research to study injuries in U.S. pork processing plants. *See* Perry Comment. Her

research produced four peer-reviewed articles on the subject. *Id.* Her team studied "over

28

350 workers over the course of three years and collected detailed measures of injury type, severity, source, and context among injured workers." *Id.* "Rushing on the line was identified as a leading cause for cut injuries among the majority of workers." *Id.* For example, in one study of 936 meatpacking workers who had experienced laceration injuries, researchers interviewed 295 of those workers to identify the causes of their injury. *Id.* (citing Lina Lander et al., *A Case-Crossover Study of Laceration Injuries in Pork Processing*, 69 Occupational & Env't Med. 410, 411 (2012), AR 63461). Of those interviewed, 22% "reported that they were rushing just before the laceration injury occurred." *Id.* at 412. Other commenters referred to Professor Perry's research. *See, e.g.*, APHA Comment at 4 n.11.

A comment submitted by Dr. Robert Harrison on behalf of the Association of Occupational and Environmental Clinics summarized research that identified the risks of developing musculoskeletal disorders in the meatpacking industry. Dr. Robert Harrison, MD, MPH, Ass'n of Occupational and Env't Clinics, Comment on Proposed Rule 2 (May 2, 2018), https://www.regulations.gov/comment/FSIS-2016-0017-79890, AR 90513. He argued that OSHA and NIOSH studies have recommended reducing line speeds and identified speed as an important factor in causing these injuries. *Id.*

A comment submitted by the American Public Health Association's Occupational Health and Safety Section further explained the connection between speed and injury rates. APHA Comment at 2–4. This comment cited and attached numerous supporting documents. For example, in 1993, OSHA adopted ergonomics guidelines for meatpacking plants. OSHA, Ergonomics Program Management Guidelines for

Meatpacking Plants (1993) ("1993 OSHA Report"), AR 63474. In that report, OSHA explained that cumulative trauma disorders and other workplace injuries are particularly prevalent in meatpacking plants. *Id.* at 1. It identified line speed as an "ergonomic hazard," which it defined as "workplace conditions that pose a biomechanical stress to the worker." *Id.* at 20. OSHA noted that slowing down the line "is *one* of a wide variety of control measures that can be implemented to address specific, identified problems." *Id.* at 24. The APHA's comment also relied on the research discussed by Professor Perry and an additional study that cited "substantial evidence that line speeds are a contributing factor to injury as well as chronic musculoskeletal conditions and other outcomes." Emmanuel Kyeremateng-Amoah, BSc, MBChB, MSPH, et al., *Laceration Injuries and Infections Among Workers in the Poultry Processing and Pork Meatpacking Industries*, 57 Am. J. Indus. Med. 669, 670 (2014), AR 63438 (citing six studies).

In addition to academic research highlighted in the comments to the Proposed Rule, the GAO has reported high rates of injury among pork processing plant workers and cited line speed as a workplace hazard. In a November 2017 report to Congress, GAO noted that "[m]eat and poultry slaughter and processing is one of the most hazardous industries in the United States." 2017 GAO Report, highlights page. In 2016, it had reported "that workers in meat and poultry slaughter and processing plants continue to face hazardous conditions, including sharp knives used in close quarters, slippery floors, and chemical exposures." *Id.* at 1 (citing GAO, GAO-16-337, Workplace Safety and Health: Additional Data Needed to Address Continued Hazards in the Meat and Poultry Industry (2016)). GAO found a lack of information available on these issues: "In

30

the 2016 report, we found that additional data are needed to address these hazardous conditions and recommended that DOL improve its data on musculoskeletal disorders and sanitation workers in the meat and poultry industry." *Id.* GAO linked these hazardous conditions to line speeds, noting that it had "concerns that high line speeds may exacerbate existing hazards that can cause musculoskeletal disorders (MSD)." *Id.* at 38. "OSHA and [NIOSH] officials told us that line speed—in conjunction with forceful exertions, awkward postures, and other factors—affects the risk of MSDs. When plants increase line speed they may address worker safety by increasing staffing or creating new lines." *Id.*; *see* Final Rule at 52,314 ("OSHA recommends that establishments should reduce line speeds and production rates to decrease injury rates.").

In March 2014, NIOSH reported the results of a study to "identify the potential for increase in musculoskeletal and upper extremities trauma due to the planned evisceration line speed increase" at a poultry plant in South Carolina. Kristin Musolin, DO, MS, et al., NIOSH, Report No. 2012-0125-3204, Evaluation of Musculoskeletal Disorders and Traumatic Injuries Among Employees at a Poultry Processing Plant at i (2014), https://www.cdc.gov/niosh/hhe/reports/pdfs/2012-0125-3204.pdf ("2014 NIOSH Report"), AR 101328. The study evaluated the presence of carpal tunnel syndrome as measured by nerve conduction tests. *Id.* at 1. 72% of the 283 workers tested were found to have abnormal results. *Id.* at 11. 42% of the 301 participating employees met the definition for carpal tunnel syndrome. *Id.* The study followed up with 34 evisceration line workers seven months after the line speed increase had been implemented. *Id.* at 16. 20 of those workers reported that their work pace had increased, while the other 14 reported no

change or a decrease in work pace. *Id.* In the follow-up, the number of workers reporting hand or wrist pain, burning, numbness, or tingling had increased slightly from 18 to 21. *Id.* at 17. The study concluded with recommendations to prevent workplace injuries. The first recommendation, among many, was to "[d]esign job tasks . . . to minimize the risk for developing carpal tunnel syndrome, which could include using the sixth cone line and reducing the speed of all cone lines to reduce repetition." *Id.* at 27.

On the other hand, there is some evidence to suggest that line speeds do not increase worker injury rates. In the Proposed Rule, FSIS analyzed OSHA data and "compared in-establishment injury rates between HIMP and traditional establishments from 2002 to 2010." Proposed Rule at 4796. It concluded that "[t]he preliminary analysis shows that HIMP establishments had lower mean injury rates than non-HIMP establishments." *Id.* Ultimately, "FSIS did not use the analysis to draw conclusions on worker safety in HIMP or non-HIMP establishments or whether there is an associated impact on food safety." Final Rule at 52,305. Furthermore, the USDA's OIG found that FSIS "may have used data that were not suitable for its worker safety analysis." OIG, USDA, Inspection Rep. 24801-0001-41, FSIS Rulemaking Process for the Proposed Rule: Modernization of Swine Slaughter Inspection 16 (2020), https://www.usda.gov/ sites/default/files/audit-reports/24801-0001-41.pdf. Specifically, the OIG found that FSIS: "(1) underestimated the ultimate importance of these data; (2) did not verify the reliability of the data with corroborating evidence; and (3) underestimated the anticipated level of risk in using these data." *Id.* at 18.

USDA and amici for the pork industry argue that line speeds do not affect the risk of injury to workers. Leadership at Clemen's Food Group, WholeStone Farms Cooperative, and Seaboard Foods submitted data about their average line speeds and the injuries reported. None of the data submitted shows any correlation between line speed and injury rates. *See* Pork Industry Amicus Brief at 5, 8, 10.

The data reported by amici and FSIS's preliminary analysis discussed in the Proposed Rule do not tip the weight of the evidence in favor of USDA on this issue.[6] Notably, FSIS did not rely on its preliminary analysis in the Final Rule. Final Rule at 52,305. Therefore, the weight of the evidence clearly demonstrates that line speeds are a risk factor that will increase the already hazardous conditions faced by workers. These risks are not merely speculative. They are supported by several academic studies, government research conducted by NIOSH, and recommendations provided by OSHA and the GAO. And the evidence of the risks is not merely a statistical possibility. The testimony of UFCW members explains how workers personally experience these risks in the workplace.[7]

---

[6]    There is some reason to be skeptical of the data reported by amici. OSHA has found that incidents are underreported due to fear of retaliation. *See* 2017 GAO Report at 24–25, n.50. This is especially true because nearly 30% of meat and poultry workers are foreign-born noncitizens who lack legal status. *Id.* at 25 n.50.

[7]    Professor Perry noted: "It doesn't take a multiyear, prospective surveillance study of pork workers to prove that line speed causes injuries. One need only spend time inside the plants observing workers and production pressures to recognize that the intensely rapid pace of the work combined with ever present additional hazards including sharp objects, noise, temperature extremes, slippery floors, and crowded spaces already make for extremely hazardous conditions for workers. Such hazards are already proven by the well above national average injury rates in the meatpacking industry." Perry Comment.

USDA argues that line speeds are but one factor among many that contribute to risk in pork processing plants. *See, e.g.*, 2017 GAO Report at 38; 1993 OSHA Report at 24; 2014 NIOSH Report at 27. But a risk of harm is not speculative for standing purposes simply because it is one of many factors. For example, in a challenge by Massachusetts to an EPA decision to forgo regulating greenhouse gas emissions, EPA argued that the state lacked standing because the agency's action was only one factor among many that would cause harms associated with climate change. *Massachusetts v. EPA*, 549 U.S. 497, 523–24 (2007). The Supreme Court rejected this argument because it rested "on the erroneous assumption that a small incremental step, because it is incremental, can never be attacked in a federal judicial forum." *Id.* at 524.

USDA argues that any increased risk of harm simply does not rise to the level of imminence necessary for Article III standing. *See Public Citizen*, 489 F.3d at 1293. To support this argument, USDA relies primarily on two cases from the D.C. Circuit, each of which concerned whether members of the general public had standing to challenge agency actions.

In *Public Citizen*, an organization challenged a traffic safety rule by arguing that its members faced an increased risk of injury from future car accidents that the rule "will fail to prevent." 489 F.3d at 1293. The court observed that "[m]uch government regulation slightly increases a citizen's risk of injury—or insufficiently decreases the risk compared to what some citizens might prefer." *Id.* at 1295. Under the plaintiff's theory in

---

These hazards have also been reported by GAO and OSHA. *See, e.g.*, 2017 GAO Report at 1; 1993 OSHA Report at 24.

that case, "after an agency takes virtually *any* action, virtually *any* citizen—because of a fractional chance of benefit from alternative action—would have standing to obtain judicial review of the agency's choice." *Id.*[8] Here, by contrast, the Plaintiffs' members are not the general public. They work in pork processing plants regulated by the Final Rule, have experienced genuine risks under the status quo, and can demonstrate how the Final Rule increases that risk. That testimony is supported by public comments and reports in the administrative record. *See, e.g.*, Final Rule at 52,314–15.

The other case relied upon by USDA is similarly distinguishable. In *Food & Water Watch*, a consumer advocacy organization sued the Secretary of Agriculture for implementing a new poultry inspection system that reduced the number of inspectors in one aspect of production. *Food & Water Watch*, 808 F.3d at 915–16. Plaintiffs sought a preliminary injunction, arguing that the new system would decrease inspections and thereby increase the public's risk of foodborne illness. *Id.* at 912. However, they did not credit aspects of the rule that would increase inspections at other points in production. *Id.* at 916. The D.C. Circuit held that the case was properly dismissed for lack of standing because the complaint did not allege that the challenged system "as a whole will produce significantly more adulterated, unwholesome chicken compared to the existing inspection systems." *Id.* at 915–16.

---

[8]    Even after noting the problems in that theory of standing, the court permitted the parties to submit additional evidence that the challenged regulation would substantially increase the risk of harm. *Public Citizen*, 489 F.3d at 1296–97.

To support the claim that the general public would be harmed by the poultry rule, plaintiffs in *Food & Water Watch* submitted affidavits from USDA inspectors who claimed that unwholesome chickens were sold because they could not be inspected at the speeds under which the existing inspection system operated. *Id.* at 916. These affidavits were insufficient because they did not speak to the differences between the status quo and the new poultry inspection system challenged. *Id.* By contrast, the testimony provided by UFCW members explains both the risks of injury under the status quo and under the NSIS. *See, e.g.*, Quinonez Decl. ¶ 8 (explaining the transition to the NSIS); Stein Decl. ¶ 7 (explaining working at increased speeds); Carrasco Decl. ¶ 7 (same). In *Food & Water Watch*, the court also found the statistics provided in the complaint were not representative and did not reflect a substantial increase in risk. 808 F.3d at 917. Here, by contrast, the administrative record contains numerous studies that contain data, analysis, and recommendations that all support a substantial increase in risk of harm.

The risk of future harm raised in this case is more akin to the challenge brought by several states to the U.S. Census Bureau's decision to add a citizenship question to the 2020 census. *See Dep't of Com.*, 139 S. Ct. at 2563–64. In that case, the states argued that the inclusion of a citizenship question would decrease the response rate of their noncitizen residents. *Id.* at 2565–66. Because the census is used to apportion political representatives and distribute federal funds to states, an undercount would cause a concrete harm. *See New York v. Dep't of Com.*, 351 F. Supp. 3d 502, 596 (S.D.N.Y. 2019) *reversed in part on other grounds* 139 S. Ct. 2551 (2019). After a trial, the district court found that a decline in self-responses by noncitizens would cause an undercount. *Id.*

36

at 590–91. The Census Bureau cited factors that it asserted would mitigate any undercount. *Id.* at 591. But, the district court rejected that argument as speculative and concluded that the risk of harm was substantial and imminent. *Id.* at 607. The Supreme Court affirmed that conclusion, holding that the risk of future harm was substantial enough for standing purposes. *Dep't of Com.*, 139 S. Ct. at 2565.

Likewise, in this case, Plaintiffs have submitted evidence that workers are more likely to suffer various injuries while working at faster speeds and that line speeds are an important factor in determining work pace. USDA's arguments that those risks will be mitigated are like the Census Bureau's arguments in *Department of Commerce*, where the Census Bureau argued that its in-person operations to follow up with non-responses would mitigate any undercount risks. 351 F. Supp. 3d at 590–91. While it was theoretically possible that such an operation would remedy an undercount, the government had not proven that it would change the outcome.[9]

Here, USDA has merely asserted that operational changes would mitigate risks and has not identified how those changes, like increasing staff or rearranging work areas, would mitigate the specific risks demonstrated by Plaintiffs. The argument here is even more attenuated than in the census case because USDA relies on the actions of regulated parties with respect to a subject that FSIS has disclaimed any ability to regulate.

---

[9]   The Second Circuit has gone further by finding that standing, once established, cannot be negated by mitigating factors: "The fact that an injury may be outweighed by other benefits does not negate standing." *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 60 (2d. Cir. 2020) (internal alterations omitted) (quoting *Denney v. Deustche Bank AG*, 443 F.3d 253, 265 (2d Cir. 2006)).

Although Seaboard Foods has hired more employees, it has not provided any evidence that those new workers will prevent an increase in work pace. Summerlin Decl. ¶ 5.[10] On the contrary, the Final Rule predicted that facilities adopting the NSIS would hire new workers to replace federal inspectors, not to maintain existing work pace. Final Rule at 52,324. FSIS predicted that these new workers would perform sorting and inspection-related activities that were previously conducted by federal inspectors. *Id.*

In short, Plaintiffs have demonstrated that the Final Rule substantially increased their members' risk of physical injury while working in pork processing plants. Those risks are sufficiently imminent to constitute an injury-in-fact under Article III.

## 2. Fairly Traceable

An injury caused by third parties is traceable to the government where it is "the predictable effect of Government action on the decisions of [those] third parties." *Dep't of Com.*, 139 S. Ct. at 2566. USDA argues that the risk of injury to Plaintiffs' members is not traceable to the Final Rule because it requires "the independent action of some third party not before the Court." *Defs. of Wildlife*, 504 U.S. at 560. USDA contends that the cause of the harm is not the elimination of line speed limits, but rather the increase in work pace caused by pork processing plants. Alternatively, it argues, the predictable effect of the regulation is that facilities will increase staffing and reconfigure the plants to maintain a similar work pace.

---

[10]     This contradicts the testimony of Jose Quinonez, who wrote that the plant hired no new workers. Quinonez Decl. ¶ 14. As the Senior Vice President of Operations at Seaboard Foods, Mr. Summerlin's statement about that plant's staffing decisions is more reliable than Mr. Quinonez's. Summerlin Decl. ¶ 1.

USDA's argument here is almost identical to one the D.C. Circuit has rejected. *See Am. Trucking Ass'ns, Inc. v. Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 248 (D.C. Cir. 2013). In *American Trucking*, the agency argued that its regulation, which increased the number of permitted work hours for truckers, did not directly cause any harm but simply allowed employers to increase the hours for their employees. *Id.* at 247–48. Because the employers were third parties, the agency argued, the truckers' alleged injuries were not traceable to the agency. *Id.* The court rejected this argument, noting the "well-established principle that standing will lie where 'a plaintiff demonstrates that the challenged agency action authorizes the conduct that allegedly caused the plaintiff's injuries, if that conduct would allegedly be illegal otherwise.'" *Id.* at 248 (quoting *Animal Legal Def. Fund, Inc. v. Glickman*, 154 F.3d 426, 440 (D.C. Cir. 1998)). The court noted that it was "'a hardly-speculative exercise in naked capitalism' to suggest motor carriers would respond to the hours-increasing provisions by requiring their drivers to use them and work longer days." *Id.* (quoting *Abigail All. For Better Access to Dev. Drugs v. Eschenbach*, 469 F.3d 129, 135 (D.C. Cir. 2006)).

The same reasoning applies squarely here. But for the Final Rule, increasing line speeds beyond the current limit, absent a waiver, would not comply with agency regulations. *See* 9 C.F.R. § 310.1(b)(3). FSIS justified the costs of the rule, in part, by explaining that the rule would allow pork plants to operate more efficiently. Final Rule at 52,335. FSIS explained that faster line speeds are "synonymous with an increase in industrial efficiency." *Id.* FSIS calculated that the rule would create annual economic benefits of $66.93 million precisely because the establishments could pack more meat by

increasing work pace. *Id.* Increased production speed and the associated economic benefits were not only a predictable effect but an *intended* effect of the Final Rule.[11] The pork industry advocated for the elimination of evisceration line speed limits so that it could increase production. *Id.* at 52,314. It is "a hardly-speculative exercise in naked capitalism" to predict that pork producers would improve their bottom line, and offset the costs of converting to the NSIS, by increasing production when a regulatory change allowed them to do so. *Am. Trucking*, 724 F.3d at 248.

FSIS's own analysis and the statements of pork processors confirm that increased work pace was a "predictable effect" that the Final Rule's line speed limit elimination had "on the decisions of third parties." *Dep't of Com.*, 139 S. Ct. at 2566. Other federal courts have similarly found that the government's own predictions are highly relevant when analyzing traceability. *See, e.g.*, *New Jersey v. EPA*, 989 F.3d 1038, 2021 WL 833292, at *6 (D.C. Cir. Mar. 5, 2021) (considering an agency's own factfinding and predictions to evaluate likely reaction of third parties); *Competitive Enter. Inst. v. FCC*, 970 F.3d 372, 382–84 (D.C. Cir. 2020) (same); *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 59–60 (2d Cir. 2020) (same); *City & Cty. of S.F. v. U.S. Customs &*

---

[11]   Indeed, USDA agrees that pork plants have already begun increasing their line speeds and testimony from Plaintiffs confirms this fact. *See* Sidrak Decl. ¶ 5; Pulver Decl. Exs. 1–2 (notices to USDA from two pork processing plants of intent to adopt the NSIS); Decl. of Leo Kanne ¶¶ 9–12 (testifying that the Smithfield plant in Denison, Iowa was remodeling the cut floor to increase production). The results predicted by Plaintiffs have begun, which suggests those results were not merely speculative at the time the lawsuit commenced. *See City & Cty. of S.F. v. U.S. Customs & Immigr. Servs.*, 944 F.3d 773, 787 (9th Cir. 2019) (noting that because the agency's own predicted results had come to pass, it was an indication that those results were predictable).

*Immigr. Servs.*, 944 F.3d 773, 787 (9th Cir. 2019) (same).  Therefore, the increased risk of harm to Plaintiffs' members is directly traceable to the line speed increase authorized by the Final Rule.

Plaintiffs have established associational standing to challenge the line speed elimination provision in the Final Rule because their members face an increased risk of physical injury that is directly traceable to the challenged agency action.

## II.   Administrative Procedure Act Challenge

The parties have filed cross-motions for summary judgment on the Plaintiffs' remaining claim under the APA. Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In a challenge to an agency action under the APA, the dispute can usually be resolved on summary judgment because "[t]he entire case on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (internal quotation marks omitted); *see Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009). Both parties agree that this case is ripe for resolution on summary judgment.

The APA requires federal "agencies to engage in 'reasoned decisionmaking.'" *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020) (quoting *Michigan v. EPA*, 576 U.S. 743, 750 (2015)). An agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" shall be held unlawful and "set aside." 5 U.S.C. § 706. Review of an agency action under this standard is "narrow and a court is not to substitute its judgment for that of the

agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc v. State Farm Mut. Auto. Ins. Co.*, 463

U.S. 29, 43 (1983). "Nevertheless, the agency must examine the relevant data and

articulate a satisfactory explanation for its action including a 'rational connection

between the facts found and the choice made.'" *Id.* (quoting *Burlington Truck Lines v.*

*United States*, 371 U.S. 156, 168 (1962)).

Plaintiffs argue that in the Final Rule, FSIS did not adequately consider what

effect eliminating line speed limits may have on worker safety. They argue that the Final

Rule violated several principles of administrative law because the agency failed to

respond to significant comments, provided an irrational explanation, did not consider all

relevant factors, changed its previous position without acknowledging the change, and

offered inconsistent reasoning. USDA argues that FSIS did not change its position in the

Final Rule and, instead, applied its longstanding position that it lacks legal authority to

take action solely to improve worker safety.

The Court will begin its analysis by summarizing relevant principles of

administrative law at play in this case. Then, because the parties dispute FSIS's historical

and current position with regard to worker safety, the Court will review the agency's

previous positions on the issue and its position in the Final Rule. Finally, the Court will

consider whether the agency engaged in reasoned decision-making when it eliminated

line speed limits for NSIS facilities.

### A. Relevant Principles of Administrative Law

An agency action may be arbitrary and capricious if the agency "failed to consider

an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

"[J]udicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'" *Regents*, 140 S. Ct. at 1907 (quoting *Michigan v. EPA*, 576 U.S. at 758). An agency may not rely on post-hoc rationalizations advanced in litigation. *Id.* at 1909–10.

When an agency takes a new course of action, it must "display awareness that it *is* changing position" and "show that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). "When an agency changes course . . . it must be 'cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.'" *Regents*, 140 S. Ct. at 1913 (quoting *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125–26 (2016)). While changing a longstanding position is permissible if the agency explains that change, it is generally impermissible when an agency changes course or offers internally inconsistent rationales during a single action. *See ANR Storage Co. v. FERC*, 904 F.3d 1020, 1024 (D.C. Cir. 2018). "It follows that an 'unexplained inconsistency' in agency policy is 'a reason for holding an interpretation to be an arbitrary and capricious change from agency practice.'" *Encino Motorcars,* 136 S. Ct. at 2126 (quoting *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005)). "An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *Fox Television Stations*, 556 U.S. at 515; *see Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923–24 (D.C. Cir. 2017).

Although an agency action is subject to a careful analysis, "[a] court is not to ask whether a regulatory decision is the best one possible or even whether it is better than the

alternatives." *FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 782 (2016). In cases where "the resolution of the dispute involves primarily issues of fact and analysis of the relevant information requires a high level of technical expertise, [courts] must defer to the informed discretion of the responsible federal agencies." *Citizens Telecomms. Co. of Minn., LLC v. FCC*, 901 F.3d 991, 1001 (8th Cir. 2018) (quoting *Minn. Pub. Util. Comm'n v. FCC*, 483 F.3d 570, 577 (8th Cir. 2007)). "An agency's predictive judgments about areas that are within the agency's field of discretion and expertise are entitled to *particularly deferential review*, as long as they are reasonable." *U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 707 (D.C. Cir. 2016) (internal alteration omitted) (quoting *EarthLink, Inc. v. FCC*, 462 F.3d 1, 12 (D.C. Cir. 2006)).

As the D.C. Circuit has explained, "a central purpose of notice-and-comment rulemaking is to subject agency decisionmaking to public input and to obligate the agency to consider and respond to the material comments and concerns that are voiced." *Make the Road N.Y. v. Wolf*, 962 F.3d 612, 634 (D.C. Cir. 2020). While an agency does not need to respond to every comment, it "must consider and respond to significant comments received during the period for public comment." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). "Nodding to concerns raised by commenters only to dismiss them in a conclusory manner is not a hallmark of reasoned decisionmaking." *Gresham v. Azar*, 950 F.3d 93, 103 (D.C. Cir. 2020). This principle arises from the APA's notice and comment procedures in 5 U.S.C. § 553(c) and relates to an arbitrary and capricious challenge under § 706 "only insofar as it demonstrates that the agency's decision was not based on a consideration of the relevant factors." *Covad Comms. Co. v.*

44

*FCC*, 450 F.3d 528, 550 (D.C. Cir. 2006) (quoting *Thompson v. Clark*, 741 F.2d 401, 409 (D.C. Cir. 1984)); *see also Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012) ("[A]n agency's failure to address a particular comment or category of comments is not an APA violation *per se*.").

### B. FSIS's Positions on Worker Safety

To assess whether FSIS departed from prior agency policy or changed its position, the Court will review the agency's previous positions on worker safety.

### 1. Historical Position on Worker Safety

FSIS has consistently considered worker safety in its rulemaking. The 2013 OGC Memo concluded that the agency could not impose regulatory requirements that related "solely to worker safety," but that it could take worker safety into consideration. OGC Memo at 9. "Nothing precludes FSIS from adopting a rule that allows the agency to fulfill its mission in a manner that is also safe for plant workers." *Id.*

Other FSIS regulatory actions confirm the position described in the 2013 OGC Memo. For example, in the 2015 rule adopting the New Poultry Inspection System ("NPIS"), worker safety was one reason FSIS decided to keep line speeds in place. Modernization of Poultry Slaughter Inspection, 79 Fed. Reg. at 49,598. FSIS expressed concerns about the negative effects faster line speeds may have on worker health and provided recommendations to poultry processing plants on how to mitigate any potential safety risks. *Id.* at 49,596. In fact, FSIS "modified the proposed regulation that prescribes maximum line speed rates under the NPIS to emphasize establishments' existing legal obligation to comply with OSHA statutes" because it wanted to "stress the importance of

45

establishment worker safety." *Id.* at 49,597. In prior rulemakings, FSIS had similarly taken safety into account. *See, e.g.*, Hazard Analysis and Critical Control Point Systems, 61 Fed. Reg. 38,806, at 38,812 (July 25, 1996) (changing a regulatory strategy after considering, among other factors, worker safety concerns raised by commenters and seeking additional comments on worker safety); Sodium Citrate as a Tripe Denuding Agent, 59 Fed. Reg. 41,640, 41,640 (Aug. 15, 1994) (permitting a new chemical agent to be used in beef processing because it was safer for workers).

## 2.  Worker Safety in the Proposed Rule

In the Proposed Rule, FSIS wrote that it was considering increasing evisceration line speed limits in the NSIS. Proposed Rule at 4796. It observed that some facilities already operated at higher line speeds under waivers from FSIS and that the actual line speeds did not greatly exceed the current limit. *Id.* It concluded that facilities operating at higher speeds "have demonstrated that they are capable of consistently producing safe, wholesome, and unadulterated pork products." *Id.* But in addition to these food-safety-related considerations, the agency wrote: "FSIS recognizes that evaluation of the effects of line speed on food safety should include the effects of line speed on establishment employee safety." *Id.* It noted that its preliminary analysis suggested that HIMP facilities had lower injury rates. *Id.* FSIS also observed that "factors other than line speed may affect injury rates (*e.g.*, automation and number of sorters per line)." *Id.*

FSIS then specifically requested "comments on the effects of faster line speeds on worker safety." *Id.* It was "interested in comments on the availability of records or studies that contain data that OSHA or [NIOSH] may be able to use in analyzing the effects of

increased line speed on the safety and health of employees throughout the establishment, including effects prior to and following the evisceration line." *Id.* FSIS asked the public to comment on whether it should keep the line speed limits in place and offer waivers for establishments that work with NIOSH to study the issue. *Id.* It also sought "comments on best practices and other measures that establishments can take to protect workers throughout the plant, including possible protective factors such as increasing the size of the workforce, rotating assignments, increased automation, or improved tools and techniques." *Id.*

Additionally, FSIS proposed adding a safety attestation requirement for pork plants. *Id.* It noted that the attestations would not be reviewed by FSIS and instead would be forwarded to OSHA, "the Federal agency with statutory and regulatory authority to promote workplace safety and health." *Id.* It also proposed adding a new severability provision, so that if a court invalidated the safety attestation, it would not affect the rest of the Proposed Rule. *Id.* This suggests that at the time the Proposed Rule was published, FSIS considered that it might lack authority to impose a requirement related solely to worker safety.

The Proposed Rule appears to be consistent with FSIS's previous position that it could consider, but not directly regulate, worker safety. Notably, FSIS did not suggest that it lacked statutory authority to take worker safety into consideration. It did precisely the opposite by citing worker safety as an important factor: "evaluation of the effects of line speed on food safety should include the effects of line speed on establishment worker safety." Proposed Rule at 4796.

47

### 3.  Worker Safety in the Final Rule

In the Final Rule, FSIS decided that "line speed limits are not necessary for establishments operating under NSIS." Final Rule at 52,314. It provided two reasons for this decision. First, it concluded that establishments operating under the HIMP pilot program "have demonstrated that they are capable of consistently producing safe, wholesome, and unadulterated pork products while operating at line speeds above the current maximum." *Id.* To support this claim, it noted that "HIMP establishments also have consistently met pathogen reduction and other performance standards when operating without prescribed maximum line speeds." *Id.* Second, it wrote that additional microbial testing measures applicable to all pork plants, not just NSIS plants, would further ensure the safety of pork products being produced at a higher speed. *Id.*

Then, FSIS summarized the comments related to worker safety. *Id.* For example, one pork producer noted that injuries had declined since it received a line speed waiver. *Id.* Other commenters cautioned against raising line speed limits. *Id.* These comments cited data from the Bureau of Labor Statistics and research from OSHA, GAO, and worker advocacy organizations that contradicted FSIS's preliminary analysis in the Proposed Rule. *Id.* at 52,314–15.

In response to these comments, FSIS stated that while it agreed "that safe working conditions in swine slaughter establishments are important, the Agency has neither the authority nor the expertise to regulate issues related to worker safety." *Id.* FSIS noted that OSHA had the authority to regulate working conditions and that FSIS was authorized by law "to administer and enforce laws and regulations solely to protect the health and

48

welfare of consumers." *Id.* It further concluded that "FSIS's authority with respect to working conditions in slaughter establishments extends only to FSIS inspection personnel." *Id.*

Despite stating that it could not regulate worker safety, FSIS enacted its proposed safety attestation requirement: "This final rule also requires establishments operating under NSIS to submit on an annual basis an attestation to the management member of the local FSIS circuit safety committee stating that the establishment maintains a program to monitor and document any work-related conditions of establishment workers." *Id.* FSIS emphasized that these would be forwarded to OSHA, which would use the attestations "in its own enforcement program." *Id.* "FSIS employees, however, will not be responsible for determining the merit of the content of the attestation or for enforcement of non-compliance with the attestation provision." *Id.* Referencing the MOU between FSIS and OSHA, FSIS explained that it would continue to partner with OSHA to "ensure identification and reporting of safety hazards impacting working conditions of FSIS inspectors and those of establishment employees." *Id.* However, at no point in the Final Rule did the agency address whether OSHA has the authority to regulate or modify line speeds.

### C. Arbitrary and Capricious Decision-Making in the Final Rule

As discussed above, FSIS historically held the position that although it could not enact regulatory requirements related solely to worker safety, it could consider the effects its actions may have on worker safety. *See, e.g.*, OGC Memo; Modernization of Poultry Slaughter Inspection, 79 Fed. Reg. at 49,597. USDA argues that the Final Rule is

49

consistent with this position because FSIS considered worker safety when it adopted the rule. However, there is nothing in the Final Rule that suggests it did so. While FSIS summarized the comments it received about worker safety, the Final Rule contains no discussion, analysis, or evaluation of the worker safety comments. *See* Final Rule at 52,315. Because there is no indication that FSIS considered worker safety in the Final Rule, the Court cannot credit its statement in litigation that it did so. *See Regents*, 140 S. Ct. at 1909; *Am. Wild Horse Pres. Campaign*, 873 F.3d at 925 ("[A]fter-the-fact claims about agency intentions do not work when agency actions evince the opposite."). Even if the Court were to credit USDA's post-hoc assertion that it considered worker safety, "[s]tating that a factor was considered, however, is not a substitute for considering it." *Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986); *see Gresham*, 950 F.3d at 103.

The only response FSIS gave to the worker safety comments it solicited was to state that it lacked authority to regulate worker safety. In context, the agency appeared to suggest that it wanted to consider the comments but was not legally permitted to do so. *See, e.g.*, Final Rule at 52,315 ("While FSIS agrees that safe working conditions in swine slaughter establishments are important, the Agency has neither the authority nor the expertise to regulate issues related to establishment worker safety."); *id.* ("FSIS's authority with respect to working conditions in slaughter establishments extends only to FSIS inspection personnel."). By offering its lack of legal authority and expertise on worker safety as its only response to the safety-related comments, FSIS gave the clear impression that it was rejecting the comments as legally impermissible considerations.

50

For example, in the Proposed Rule, the agency reported that it had analyzed worker injury rates under HIMP. Proposed Rule at 4796. Ultimately, however, "FSIS did not use the analysis to draw conclusions on worker safety in HIMP or non-HIMP establishments or whether there is an associated impact on food safety." *Id.* at 52,305. It explained that it did not use the analysis because "the Agency does not have the authority to regulate issues related to establishment worker safety." *Id.* By declining to use its own analysis, FSIS demonstrated that it would not consider worker safety in the Final Rule.

Now, in litigation, USDA has raised another post-hoc rationalization for its non-response to the worker safety comments: FSIS was merely distinguishing between its authority to *regulate* worker safety and its authority to *consider* worker safety. While this position is documented in the OGC Memo and appears to be consistent with prior agency policy, that distinction is discussed nowhere in the Final Rule itself. Even if the Court were to consider this reason, which was not given at the time of the agency action, it would render FSIS's response in the Final Rule a non sequitur at best. If FSIS's response merely made the point that it lacked authority to impose new regulatory obligations related solely to worker safety, then it was unrelated to the comments because the comments did not concern a new regulatory requirement. Instead, the comments explain, at the agency's behest, how the line speed limit elimination will affect workers.

On the face of the Final Rule, the public had no way of knowing about FSIS's legalistic distinction between regulating and considering. By implying that FSIS could not respond to the safety-related comments, the Final Rule provided a shield that allowed the agency to avoid explaining why it chose to not only increase, but entirely eliminate

line speed limits despite decades of research about the effects that change could have on workers.

If, as USDA argues, FSIS did not change its position with respect to considering worker safety, then it would have considered the safety-related comments. Or, if it did change its position and decide that it could not consider the comments, it would have explained that change of position. FSIS did neither. Instead, it was silent as to its ability to consider worker safety, did not consider the comments, and did not explain a change of position. An agency is permitted to change its position and to take action even when some factors might weigh against taking that action. It simply must give a reasoned explanation for its change of position or its decision to move forward despite the concerns. *See Encino Motorcars*, 136 S. Ct. at 2127; *Fox Television Stations*, 556 U.S. at 515 (explaining that an agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better"). By failing to do either, FSIS failed to give the public an adequate explanation for its actions.

FSIS's lack of reasoned analysis here is further underscored by an internal inconsistency in the Final Rule. *See Encino Motorcars,* 136 S. Ct. at 2126. After stating that it could not regulate worker safety, FSIS enacted a regulatory provision that related solely to worker safety: the attestation requirement. Final Rule at 52,315. USDA argues that the attestation requirement was consistent with agency policy because it was collaborating with OSHA. Although the Final Rule made clear that FSIS would not

evaluate the attestations, it still imposed a regulatory burden that relates solely to worker safety. Whether the adoption of the attestation is within the scope of FSIS's authority is not a question in this case. However, the adoption of the attestation requirement is clearly inconsistent with its failure to even consider the comments about worker safety.

USDA argues that the inclusion of the attestation statement in the Final Rule demonstrates that the agency considered the worker safety comments. However, FSIS never explained whether OSHA has the legal authority to address the worker safety problem it identified. FSIS stated that "OSHA is the Federal agency with statutory and regulatory authority to promote workplace safety and health," but did not explain whether OSHA has the authority to modify line speeds for workplace safety reasons. Final Rule at 52,305. By contrast, "FSIS retains the ability to slow or stop the line, as needed." *Id.* at 52,300. FSIS inspectors may stop the line if there are "factors that may indicate a loss of process control." 9 C.F.R. § 310.26(c). As one worker noted, inspectors might stop the line if they notice a worker is injured or bleeding. Bell Decl. ¶ 12. Even though FSIS has the authority to stop or slow the lines, FSIS might have justified referring the line speed safety issue to OSHA if it had found that OSHA also had the authority and expertise to modify line speeds. Without any explanation as to why or how OSHA might address the line speed concerns FSIS identified, however, FSIS's failure to consider the comments could not be justified by simply referring the matter to OSHA.

Crucially in this case, FSIS had identified worker safety as an important factor that it ought to consider when setting line speeds. When it failed to consider worker safety in the Final Rule, it "failed to consider an important aspect of the problem." *Motor Vehicle*

*Mfrs. Ass'n*, 463 U.S. at 43. In the Proposed Rule, FSIS explained that "evaluation of the effects of line speed on food safety should include the effects of line speed on establishment employee safety." Proposed Rule at 4796. This was consistent with its 2015 rulemaking that retained poultry line speed limits because of worker safety concerns. Modernization of Poultry Slaughter Inspection, 79 Fed. Reg. at 49,597. The Proposed Rule devoted several paragraphs to discussing worker safety and expressly invited public comment on the topic. In the Final Rule, FSIS "turned on a dime" and did not consider the very comments it invited. *ANR Storage Co.*, 904 F.3d at 1027.

USDA argues that the agency had determined that it lacked legal authority to retain the line speed limits solely for purposes of worker safety. In other words, it argues that FSIS had considered all the factors and found that only worker safety counselled against eliminating line speed limits. That may be a "valid reason," but it "does not establish that [the agency] considered that option." *Regents*, 140 S. Ct. at 1913. Although this explanation was only raised in litigation and was not discussed in the Final Rule, USDA argues that it is discernable from the analysis in the Final Rule. *Dolgencorp, LLC v. NLRB*, 950 F.3d 540, 551 (8th Cir. 2020) (noting that a court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned" (quoting *Nebraska v. EPA*, 812 F.3d 662, 666 (8th Cir. 2016)). But, as explained above, the agency gave no indication that it considered worker safety, let alone that it considered all the factors and determined that worker safety alone weighed in favor of maintaining line speed limits.

Even if the Court were to credit USDA's post-hoc explanation that it lacked legal authority to take action solely because of worker safety, the agency would still need to explain how that position squared with its previous decision to maintain poultry line speeds for worker safety reasons. Modernization of Poultry Slaughter Inspection, 79 Fed. Reg. at 49,597; *see Encino Motorcars*, 136 S. Ct. at 2127; *Fox Television Stations*, 556 U.S. at 515. Generally speaking, an agency is entitled to deference with respect to its analysis of its own statutory authority and its scope of expertise. *See City of Arlington v. FCC*, 569 U.S. 290, 301 (2013); *U.S. Telecom. Ass'n*, 825 F.3d at 707. But that principle does not absolve an agency of its duty to explain a change in its reading of its statutory authority. For example, in a case where the U.S. Forest Service did not provide reasoned analysis for reversing a policy, it could not justify the change by arguing, in litigation, that the prior policy was made without legal authority. *Am. Wild Horse Pres. Campaign*, 873 F.3d at 928.

USDA's argument about the scope of its legal authority is similar to the justification the Acting Secretary of Homeland Security gave for the termination of the Deferred Action for Childhood Arrivals ("DACA") program. *See Regents*, 140 S. Ct. at 1910. The Fifth Circuit had held that a similar deferred action program was contrary to the Immigration and Nationality Act because it made noncitizens eligible for public benefits. *Id.* at 1911. The Attorney General had adopted this reasoning to find DACA illegal and the Acting Secretary terminated the program on that basis. *Id.* The Supreme Court held that this decision was arbitrary and capricious because it failed to address "the forbearance policy at the heart of DACA." *Id.* at 1912. Importantly, the agency had

previously found that forbearance was "especially justified for productive young people who were brought here as children and know only this country as home." *Id.* (internal quotation marks omitted). It needed to take that previous finding into consideration alongside the public benefits aspects of DACA. *Id.* As the Court explained, "deciding how best to address a finding of illegality moving forward can involve important policy choices, especially when the finding concerns a program with the breadth of DACA." *Id.* at 1910.

Similarly, in this case, FSIS could not simply disregard important policy considerations it had previously identified because of a conclusion about the scope of its legal authority. FSIS had identified safety concerns in the Proposed Rule and had recently declined to increase poultry line speeds because of safety issues. Those concerns involved "important policy choices" that the agency needed to address because it had flagged those choices as important considerations. *Id.* at 1910.[12]

The agency's rejection of worker safety concerns is not merely a technicality. It had wide-reaching implications for workers and pork plant operators. Many of these stakeholders submitted comments directly addressing the issue. As the comments to the Proposed Rule demonstrate, there are compelling arguments on all sides of the issue.

---

[12]     Pork industry amici emphasize that the line speed limits were not originally enacted to promote worker safety but to facilitate inspections. Pork Industry Amicus Brief at 3; *see* Swine Post-Mortem Inspection Procedures and Staffing Standards, 46 Fed. Reg. 43,406, 43,409 (Aug. 28, 1981). However, since the adoption of line speed regulation nearly forty years ago, FSIS has identified worker safety as an important consideration. *See, e.g.*, Proposed Rule at 4796. The problem in this case is that the agency failed to consider a factor that it had previously identified as important. *See Regents*, 140 S. Ct. at 1912; *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 50–51.

Members of the pork industry advocated for the elimination of line speed limits because it would allow them to increase production and realize economic efficiencies. On the other hand, workers raised concerns about their physical health and safety in the absence of line speed limits. "Making that difficult decision was the agency's job, but the agency failed to do it." *Regents*, 140 S. Ct. at 1914.

Therefore, for the reasons discussed above, FSIS's elimination of line speed limits in the NSIS was arbitrary and capricious in violation of the APA. *See* 5 U.S.C. § 706.

## III.   Remedies

The APA contemplates vacatur and remand where, as here, an agency action was arbitrary and capricious. 5 U.S.C. § 706; *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 57 (instructing the lower court to remand the case to the agency for further consideration); *see Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) ("We have made clear that when a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated . . . ." (cleaned up)); *cf. Citizens Telecomms. Co. of Minn., LLC v. FCC*, 901 F.3d 991, 1006 (8th Cir. 2018) (vacating a portion of the final rule challenged for lack of proper notice). Plaintiffs argue that the entire rule should be vacated. USDA argues that the rule should be remanded back to the agency without vacatur and, if it is vacated, that the Court should sever the rule and only vacate the provision eliminating line speed limits.

### A.  Severability

The APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise

not in accordance with law." 5 U.S.C. § 706(2). The APA defines an "agency action" as including "the whole *or a part of an agency rule*." *Id.* §§ 551(13), 701(b)(2) (emphasis added). "Thus, the APA permits a court to sever a rule by setting aside only the offending parts of the rule." *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 351 (D.C. Cir. 2019).

The Supreme Court has held a regulation severable where severance would "not impair the function of the statute as a whole, and there is no indication that the regulation would not have been passed but for its inclusion." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 294 (1988) (invalidating only the provision of a regulation that exceeded the agency's statutory authority).[13] The D.C. Circuit has articulated this standard as a two-part test. "First, the court must find that the 'agency would have adopted the same disposition regarding the unchallenged portion of the regulation if the challenged portion were subtracted.'" *Carlson*, 938 F.3d at 351 (quoting *Sierra Club v. FERC*, 864 F.3d 1357, 1366 (D.C. Cir. 2017)). "Second, the parts of the regulation that remain must be able to 'function sensibly without the stricken provision.'" *Id.* (quoting *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 710 (D.C. Cir. 2014)).

Here, USDA clearly satisfies the two-pronged severability test. First, it is likely that FSIS would have implemented the NSIS rule even without the elimination of line speed limits. FSIS eliminated line speed limits because they were "not necessary" under

---

[13]    More recently, the Supreme Court has noted a strong presumption in favor of severability where part of a statute is found unconstitutional. *See Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2209 (2020) (plurality opinion with a majority of justices concurring in the judgment with respect to severability); *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2350 (2020) (same).

NSIS. Final Rule at 52,314. That does not suggest that the line speed limit elimination

was essential to the entire NSIS program but was an additional measure made possible by

NSIS. When it promulgated the new poultry system regulations, FSIS implemented a

similar program, but retained line speed limits. Modernization of Poultry Slaughter

Inspection, 79 Fed. Reg. at 49,597. This also suggests that the agency would have still

implemented NSIS even if it had retained the line speed limits.

Second, the NSIS program can function without the elimination of line speed

limits. The maximum line speeds were established by the staffing standards applicable to

the traditional inspection system. *See* 9 C.F.R. § 310.1(b)(3)(ii). The Final Rule

established the NSIS as an alternative to that system but retained the traditional

inspection system standards for any facility not using NSIS. *Id.* ("Traditional inspection

shall be used for swine when NSIS is not used."). The line speed limit elimination was

codified as a freestanding subsection section in the Code of Federal Regulations. *See id.*

§ 310.26(c); Final Rule at 52,314–15.[14] Under this regulatory scheme, absent the line

speed limit elimination in § 310.26(c), a facility would need to follow the line speeds

established in § 310.1(b)(3)(ii). Those line speeds are based on the number of inspectors

present. 9 C.F.R. § 310.1(b)(3)(ii). NSIS facilities could follow those speed limits

because FSIS inspectors must still conduct post-mortem inspections. *See* Proposed Rule

---

[14]     In the Final Rule, FSIS enacted a severability provision with respect to the
attestation requirement. *See* 9 C.F.R. § 310.28. This could suggest that the agency
intended that the rest of the regulation was not severable. This, however, only reveals
silence as to the severability of the line speed provision and silence alone will not
override the presumption in favor of severability. *Cf. Am. Ass'n of Pol. Consultants*, 140
S. Ct. at 2351 (plurality opinion).

at 4794. Both the codification of line speed limit elimination as a separate provision and the use of the traditional system as a backstop would allow the NSIS to "function sensibly without the stricken provision." *Carlson*, 938 F.3d at 351.

In short, the Final Rule is severable and any remedy will only affect the line speed elimination, codified at 9 C.F.R. § 310.26(c).

### B. Remand Without Vacatur

"While unsupported agency action normally warrants vacatur," a district court has discretion to remand an action to the agency without vacatur. *Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1151 (D.C. Cir. 2005) (internal citation omitted); *Util. Solid Waste Activities Grp. v. EPA*, 901 F.3d 414, 436 (D.C. Cir. 2018) (per curiam); *see WaterLegacy v. EPA*, 300 F.R.D. 332, 345 (D. Minn. 2014). Although vacatur is the only remedy expressly contemplated by the APA, courts have used a remand without vacatur to give the agency a chance to fix minor deficiencies without disruption. *See* 5 U.S.C. § 706; *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993) (declining to vacate a procedurally invalid rule where it was "conceivable" that the agency could provide a reasoned explanation on remand).

When considering whether to vacate an agency action, courts will weigh two factors established by the D.C. Circuit in *Allied Signal,* 988 F.2d at 150–51. These factors are "(1) the seriousness of the deficiencies of the action, that is, how likely it is the agency will be able to justify its decision on remand; and (2) the disruptive consequences of vacatur." *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 197 (D.C. Cir. 2009)

(cleaned up). The D.C. Circuit will "generally grant an agency's motion to remand so long as 'the agency intends to take further action with respect to the original agency decision on review.'" *Util. Solid Waste Activities Grp.*, 901 F.3d at 436 (quoting *Limnia, Inc. v. U.S. Dep't of Energy*, 857 F.3d 379, 387 (D.C. Cir. 2017)). A court will deny the motion where a remand "would unduly prejudice the non-moving party" or "if the agency's request appears to be frivolous or made in bad faith." *Id.*

### 1.  Deficiencies of the Action

The first *Allied Signal* factor weighs in favor of vacatur where the agency failed to engage in reasoned decision-making or to respond to contrary arguments that rested on solid data. *See, e.g.*, *Comcast Corp. v. FCC*, 579 F.3d 1, 8 (D.C. Cir. 2009). Since the recent Supreme Court decision in *Regents*, it is unclear whether FSIS will be able to rehabilitate its Final Rule without taking a new action. 140 S. Ct. at 1907–08. *Regents* reaffirmed that an agency cannot justify a prior rule on new grounds: "An agency must defend its actions based on the reasons it gave when it acted." *Id.* at 1909. Unless it takes a new action, an agency may only rehabilitate an inadequately supported action by giving "a fuller explanation" of reasons it gave at the time of the original action. *Id.* at 1907–08. Prior to *Regents*, the D.C. Circuit allowed agencies to supply new reasons on remand. *See, e.g.*, *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1048 (D.C. Cir. 2002). In *Alpharma Inc. v. Leavitt*, cited by USDA in this case, the D.C. Circuit noted that the rule against post-hoc rationalizations did not prohibit the agency from offering new rationales; instead, it only prohibited lawyers from coming up with new reasons in litigation. 460 F.3d 1, 6–7 (D.C. Cir. 2006). The Supreme Court rejected this position and prohibited

consideration of any rationale that goes beyond the initial reasons offered by the agency. *Compare Regents*, 140 S. Ct. at 1909 *with id.* at 1934 (Kavanaugh, J., concurring in part and dissenting in part) (citing *Alpharma*, 460 F.3d at 6).[15]

Because FSIS's authority to eliminate line speed limits is undisputed in this case, USDA argues that it simply needs to publish a more robust response to the comments about worker safety. Plaintiffs argue that a remand would be futile in this case because FSIS cannot justify the Final Rule using the reasons it gave at the time.

USDA's position in its briefing and at oral argument suggested that it intends to make the same decision after adding some supplemental responses to the Federal Register. However, offering reasonable explanations for agency action is not merely "an idle and useless formality." *Regents*, 140 S. Ct. at 1909 (quoting *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6 (1969)). As the Supreme Court explained:

> Requiring a new decision before considering new reasons promotes agency accountability by ensuring that parties and the public can respond fully and in a timely manner to an agency's exercise of authority. Considering only contemporaneous explanations for agency action also instills confidence that the reasons given are not simply convenient litigating positions. Permitting agencies to invoke belated justifications, on the other hand, can upset the orderly function of the process of review, forcing both litigants and courts to chase a moving target.

*Id.* (internal quotation marks and citations omitted). These considerations are implicated in this case. FSIS failed to engage in reasoned decision-making by offering conclusory explanations, changing its position without acknowledging that reversal, and failing to

---

[15]     Although the reasoning in *Regents* is in tension with the D.C. Circuit holding in *Alpharma*, as Justice Kavanaugh notes in dissent, a remand without vacatur was not an issue before the Supreme Court. *See Regents*, 140 S. Ct. at 1934 (Kavanaugh, J., concurring in part and dissenting in part) (citing *Alpharma*, 460 F.3d at 6).

meaningfully respond to comments supported by data. The purpose of a remand without vacatur in this case would be to ensure that the agency meaningfully considers the comments it disregarded and weighs the significant policy issues noted above. It is difficult to see, on this record, how the agency could address the Final Rule's deficiencies without coming up with new reasons for its decision.

In light of these issues, it is unclear whether FSIS can rehabilitate its Final Rule without taking an entirely new agency action.[16] Therefore, the first *Allied Signal* factor counsels against a remand without vacatur.

### 2. Disruptive Consequences of Vacatur

USDA argues that vacating the rule would have many disruptive consequences. It argues that some pork processing plants have spent millions of dollars reconfiguring their facilities and would need to convert back to the traditional system. It also had concluded that establishments were likely to hire six to eleven employees per line, per shift, and that those workers would be laid off. This would be especially detrimental given the current unemployment rate.

---

[16] While it appears unlikely that the agency can rehabilitate its Final Rule without taking a new action, the ultimate question of whether the agency can do so is outside the scope of this case. The *Allied Signal* factors require courts to consider what the agency might do to correct an APA violation. This discussion should only be considered in the context of the first *Allied Signal* factor and should not be construed to opine on or limit the agency's future actions. *See POET Biorefining - Hudson, LLC v. EPA*, 971 F.3d 802, 806 (8th Cir. 2020) (per curiam) ("Opining about the standards EPA should apply to POET's pending application would amount to an advisory opinion, which we have no jurisdiction to issue.").

The amicus brief and supporting exhibits submitted by the pork industry similarly argue that a vacatur would be disruptive. One producer, Clemens, testified that it would lose $63 million in investments and $42 million in profits annually. Patton Decl. ¶ 15. Seaboard Foods noted that it spent $82 million to upgrade to the NSIS. Summerlin Decl. ¶ 14. Seaboard also testified that its employees would need to work an additional 23 Saturdays each year to achieve the same production output absent the NSIS. *Id.* ¶ 13.

The pork industry amici argue that reimposing a line speed limit would disrupt the entire supply chain and add to the financial hardships caused by the COVID-19 pandemic. Pork Industry Amicus Brief at 12. According to amici, the pandemic has limited the capacity at pork processing facilities, which caused a backlog of hogs on farms. *Id.* Clemens estimated a line speed cap will limit its pork supply by 1,235,000 hogs annually. Patton Decl. ¶ 15. Additionally, amici argue that they have relied upon the Final Rule and a vacatur would disrupt those settled expectations overnight. Pork Industry Amicus Brief at 14.

Many of the negative consequences discussed by USDA and the pork industry amici would result from a vacatur of the entire NSIS. As explained above, the line speed limit elimination is severable and the Court would only vacate that provision. When asked about the disruptive consequences of vacating only the line speed provision at oral argument, USDA's attorney acknowledged that the agency had not differentiated between the disruption of vacating the entire rule and only that provision. Without an analysis of what consequences are specific to the line speed limit elimination, it is difficult to evaluate the disruptive consequences cited by amici and USDA. Despite those

challenges, the cost-benefit analysis in the Final Rule provides some window into the consequences of a vacatur because it contains a specific breakdown of costs attributable to various aspects of the NSIS.

In the cost-benefit analysis, FSIS first noted costs of additional establishment workers. It anticipated that pork plants would hire additional workers to perform sorting and inspection-related activities previously performed by FSIS inspectors. Final Rule at 52,324. Even with the previous line speed limits in place, facilities operating under the NSIS would still need to perform most of these duties. *See* 9 C.F.R. §§ 309.19, 310.26(b) (shifting carcass sorting and disposition responsibilities to pork processing establishments). The new duties FSIS identified related to sorting and identifying contaminated animals, trimming defects, and recordkeeping to document inspections. Final Rule at 52,324. These tasks flow from the NSIS requirement that establishments conduct pre-inspection sorting, not the line speed change. *See id.* at 52,311.

Next, FSIS noted that establishments "may voluntarily reconfigure or update their facilities to fully capture all the potential production efficiencies offered through participation in the NSIS." *Id.* at 52,325. FSIS did not identify the costs of these voluntary changes in the Final Rule. The remaining costs associated with the NSIS are related to developing ante-mortem written procedures and the ready-to-cook pork standards, neither of which relate to line speeds. *Id.* The remainder of the costs noted by the Final Rule are unrelated to the NSIS and apply to all swine slaughter establishments, regardless of whether they adopt the NSIS. *Id.* at 52,326.

Based on the analysis in the Final Rule, it appears that most of the industry costs incurred will not be forfeited by a vacatur of the line speed limit elimination under the NSIS. Additionally, as the amici have noted, production slowed because of the COVID-19 pandemic. This suggests that the NSIS facilities have already adapted to lower speeds, despite expectations that line speeds could increase. Those disruptions have already reduced the economic benefits of increased line speeds and would have occurred regardless of whether the line speed limits were in place. *See* Final Rule at 52,335. If the Court leaves the line speed limit elimination in place for an indeterminate amount of time on remand, it is likely that more facilities will increase production and adopt faster line speeds that may potentially need to be reduced in the future, should FSIS fail to justify its decision. Vacating the line speed provision would prevent more parties from relying on a line speed increase that may not be reinstated. For these reasons, the second *Allied Signal* factor counsels against remand without vacatur.

In short, USDA has not persuaded the Court that it should exercise its discretion to depart from the normal APA remedy of vacatur.

### C. Temporary Stay of Vacatur

Although both *Allied Signals* factors weigh against a remand without vacatur, the Court acknowledges that FSIS created significant reliance interests by eliminating line speed limits under the NSIS. Pork producers made substantial changes to their operations relying, in part, on forecasted revenue increases from operating at higher speeds. And, because of the line speed change, some producers are currently operating at higher

66

speeds. If a vacatur were to take effect immediately, pork producers may be forced into a period of noncompliance with the line speed limits. *See* 9 C.F.R. § 310.1(b)(3)(ii).

Additionally, the line speeds are intertwined with the staffing standards under the traditional inspection system. *See id.* Because the NSIS pork producers have reconfigured their plants under the assumption that they would not need to follow the traditional system's staffing standards or line speeds, a reimposition of the traditional system's line speeds may introduce operational uncertainty. While the line speeds are sufficiently independent from the rest of the NSIS for the purposes of severability analysis, immediate vacatur of the line speed elimination provision could introduce operational uncertainties and possible regulatory confusion.

In circumstances where neither an immediate vacatur nor a remand without vacatur is appropriate, courts have found that "a combined approach is warranted." *Bauer v. Devos*, 332 F. Supp. 3d 181, 184 (D.D.C. 2018). A district court has "remedial discretion" to stay an order vacating an agency action. *Friends of the Earth, Inc. v. EPA*, 446 F.3d 140, 148 (D.C. Cir. 2006); *see, e.g.*, *NAACP v. Trump*, 298 F. Supp. 3d 209, 249 (D.D.C. 2018) (staying order of vacatur); *Nat. Res. Def. Council, Inc. v. EPA*, 301 F. Supp. 3d 133, 145 (D.D.C. 2018) (same). The D.C. Circuit has used a similar approach where an immediate vacatur may "sow confusion" in the public without intervening direction from the agency. *Chamber of Com. of the U.S. v. SEC*, 443 F.3d 890, 909 (D.C. Cir. 2006).

In this case, the agency "is in a better position than the court to assess the disruptive effect" of an immediate vacatur. *Id.* To avoid causing an immediate change,

the Court will stay its order and entry of judgment in this case for 90 days. This will allow the agency to decide how to proceed in light of this opinion and give regulated entities time to prepare for any operational change.

## CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Plaintiffs' Motion for Summary Judgment [ECF No. 67] on Count 1 of the Complaint is GRANTED IN PART as follows:

   a. Defendant's Final Rule, Modernization of Swine Slaughter Inspection, is VACATED only insofar as it eliminates line speed limits under the New Swine Inspection System.

2. Defendant's Motion for Summary Judgment [ECF No. 87] is DENIED.

3. Defendant's Motion for Remand Without Vacatur [ECF No. 40] is DENIED.

4. This case is REMANDED to the United States Department of Agriculture's Food Safety and Inspection Service for further consideration.

5. This order and entry of judgment in this case are STAYED for 90 days.

Dated: March 31, 2021

s/ Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge